J-A15034-17

2017 PA Super 320

C.G.

    Appellant

        v.

J.H.

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1733 MDA 2016

Appeal from the Order Entered September 22, 2016
In the Court of Common Pleas of Centre County
Civil Division at No(s): 2015-4710

BEFORE: MOULTON, J., SOLANO, J., and MUSMANNO, J.

OPINION BY SOLANO, J.:            **FILED OCTOBER 11, 2017**

Appellant C.G. appeals from the order sustaining Appellee J.H.'s preliminary objection to C.G.'s standing to seek custody of a ten-year-old child, J.W.H., who is J.H.'s biological son. We affirm.

J.W.H. was born in Florida in October 2006, while C.G. and J.H. lived together as a same-sex couple. The child was conceived by intrauterine insemination. C.G. and J.H. continued to live together for about five more years, and they then separated. J.H. and J.W.H. moved to a separate residence in Florida in February 2012 and moved to Pennsylvania in July 2012. Trial Ct. Op., 9/22/16, at 1-2.

C.G. instituted this action on December 8, 2015, seeking shared legal custody and partial physical custody of J.W.H. She averred that although J.H. is the biological mother of the child, C.G. "also acted (and acts) as a mother to the minor child as well, as the minor child was conceived by

mutual consent of the parties, with the intent that both parties would co-parent and act as mothers to the minor child." Custody Compl. at ¶ 3. C.G. stated that the child lived with her and J.H. from his birth in 2006 until the parties' separation in January or February of 2012. *Id.*; *see* N.T., 2/5/16, at 5-6 (correcting date of separation). C.G. alleged that both she and J.H. participated in selecting a sperm donor and that C.G. "served daily as the minor child's mother, by attending pre-natal appointments, participating in the birth of the minor child, cutting the cord when the minor child was born, and otherwise serving as [the child's] mother along with [J.H.]." Custody Compl. at ¶ 7(B), (C).

On January 6, 2016, J.H. filed preliminary objections that challenged C.G.'s standing to seek custody. Specifically, J.H. sought dismissal of the complaint pursuant to Pa.R.Civ.P. 1028(a)(5) ("lack of capacity to sue . . . .") and (4) ("legal insufficiency of a pleading (demurrer)"). J.H. disputed the averments in C.G.'s custody complaint. J.H. alleged that the decision to have a child was hers alone, C.G. did not want to have another child,[1] and J.H. alone selected the sperm donor and paid all costs associated with the intrauterine insemination. Defendant's Prelim. Objs. at ¶ 12(a)-(c). In addition, J.H. stated that she has acted as the child's sole parent since his birth, and C.G.'s role was "solely that of [J.H.]'s girlfriend from the child's birth until November 2011, when [C.G.] cheated on [J.H.]." *Id.* at ¶ 12(e).

---

[1] C.G. had two children from a previous relationship.

J.H. averred that she has provided almost all of the financial support for the child and made all decisions regarding the child's education, medical care, and development. *Id.* at ¶ 12(f)-(g). J.H. said that she and the child moved out of C.G.'s Florida house in February 2012 at C.G.'s request and moved to Pennsylvania at the end of July 2012. *Id.* at ¶ 12(i). According to J.H., after she and the child moved to Pennsylvania, C.G. spoke minimally to the child and provided almost no financial support. *Id.* at ¶ 12(j).

C.G. filed a response to the preliminary objections, asserting that she had standing under the Child Custody Law both as a parent of the child, **see** 23 Pa.C.S. § 5324(1), and as a person who stood *in loco parentis* to the child, **see id.** § 5324(2).[2]

On February 5, April 12, and June 20, 2016, the trial court held hearings on the preliminary objections, during which it received conflicting testimony from sixteen witnesses about C.G.'s role in the child's life. On September 22, 2016, the trial court issued an opinion and order that

---

[2] Section 5324 provides:

**Standing for any form of physical custody or legal custody.**

The following individuals may file an action under this chapter for any form of physical custody or legal custody:

(1) A parent of the child.

(2) A person who stands in loco parentis to the child.

(3) A grandparent of the child who is not in loco parentis to the child [under specified conditions not relevant here].

sustained J.H.'s preliminary objection to C.G.'s standing under Rule 1028(a)(5) and dismissed the custody complaint with prejudice. The court dismissed J.H.'s demurrer under Rule 1028(a)(4) as moot.

The court held that C.G. did not have standing as a parent of J.W.H., explaining: "[b]oth parties agree that at the time and place of the child's birth, [C.G.] was not considered a parent of the child because same-sex marriage and second parent adoption was not yet recognized in Florida in 2006." Trial Ct. Op. at 3. In the court's view, the controlling question therefore was whether C.G. stood *in loco parentis* to J.W.H. In turning to that question, the court recognized that "[a] domestic partner with no biological connection to a child may stand in loco parentis to a child," *id.* at 4, and that it therefore needed to consider "whether the third party lived with the child and the natural parent in a family setting, irrespective of its traditional or nontraditional composition, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent." *Id.* (quoting *Bupp v. Bupp*, 718 A.2d 1278, 1281 (Pa. Super. 1998)).

The court then engaged in an extensive review of the evidence from the hearing. The court began:

> The issue before the Court is whether [C.G.] assumed parental duties and obligations for the child, as alleged by [C.G.], or merely was involved in the child's life as [J.H.]'s significant other, as argued by [J.H.]. [J.H.] was added to the deed to [C.G.]'s house, and a joint home equity line of credit was obtained by the parties to renovate the residence prior to the child's birth. The parties agree that [J.H.] went through the

insemination process during their relationship while the parties were living together. [J.H.] and child lived with [C.G.] in Florida for nearly six years of his life, and the child referred to [C.G.] as "Mama Cindy" and [J.H.] as "Mom." The parties had a commitment ceremony, baby shower, and both parties were present for the child's birth and christening.

Outside these basic facts [C.G.]'s testimony and [J.H.]'s testimony is often in direct conflict. . . . [C.G.] testified that she is a parent, acted like a parent, and was held out as a parent to others and to the child, while [J.H.] claims [C.G.] had no desire or intent to parent the child, and all interactions between [C.G.] and the child were merely incidental to [C.G.] and [J.H.]'s relationship.

Trial Ct. Op. at 5. The court said that it had to resolve this "direct conflict" by assessing the credibility of the witnesses and the weight of the testimony. *Id.* The court engaged in that task by methodically discussing six categories of evidence: documents; testimony regarding care for J.W.H.'s physical, emotional, and social needs; evidence regarding financial support; "perception" evidence; evidence regarding any bond between J.W.H. and C.G.; and "post-separation conduct." *Id.* at 5-10.

Citing *J.A.L. v. E.P.H.*, 682 A.2d 1314, 1321 (Pa. Super. 1996), the court looked at documents for evidence of "the intent of a party to parent a child, particularly in a nontraditional family setting." Trial Ct. Op. at 5. Following the parties' commitment ceremony in 2005, J.H. wrote a note to C.G. that referred to "having a child together" and wrote her another note about their mutual "joy and excitement" following J.W.H.'s baby shower. But C.G. was not listed on J.W.H.'s birth certificate, and J.W.H. did not bear C.G.'s last name. *Id.* at 6. The court found that the parties "took no steps

to formalize a co-parenting arrangement" and executed no documents to that effect; nor did they consider adoption by C.G. after second parent adoptions became legal in Florida in 2010. *Id.* J.H.'s brother and sister-in-law (not C.G.) were chosen as J.W.H.'s godparents, and C.G. was not named as J.W.H.'s guardian in the event J.H. could not care for him. *Id.* at 7. C.G. did list J.W.H. as her "son" and a beneficiary on her life insurance policy. *Id.* at 6. On the other hand, C.G. "was not listed as a parent or sponsor on school documents, but was merely an emergency contact, or . . . not listed at all." *Id.* at 7. On medical documents, C.G. was "listed as 'partner' not 'mother' or 'parent.'" *Id.* C.G. initially carried J.W.H. on her medical and dental insurance and used her flexible spending account to pay for some of his prescriptions and insurance co-payments, but she removed J.W.H. from that insurance after she and J.H. separated. The court stated:

> While the parties dispute who initiated the removal of the child from the insurance, the Court finds [J.H.]'s testimony credible. [J.H.] testified that [C.G.] was removing her and the child from the policy, and that the child could not remain covered by [C.G.]. Such action was consistent with [C.G.]'s post-separation conduct of removing [J.H.] and the child from her residence, and ending any financial support for the child.

*Id.* at 6-7.

With respect to J.W.H.'s "[p]hysical, [e]motional, and [s]ocial needs," the court found:

> The pre-separation conduct of [C.G.] and [J.H.] does not indicate that they intended [C.G.] to be a parent to the child. The testimony varied greatly on the duration and nature of the care [C.G.] provided to the child. [C.G.] worked full-time Monday through Friday, and [J.H.] worked part-time two or

three evenings a week and on Saturdays for approximately 10-12 hours a week. [J.H.] disputes that [C.G.] was an equal caregiver, and characterizes [C.G.]'s participation in childcare as that of a babysitter. Others characterized the interactions between [C.G.] and the child as playing, not parenting. [C.G.] would relieve the babysitter in the evenings [J.H.] worked, and cared for the child until [J.H.] arrived home. [C.G.] testified she prepared meals, went on small outings, took the child for haircuts, and would sometimes get him ready for bed in the evening. [J.H.] testified [C.G.], on occasion, refused to care for the child, and she was left to find alternative childcare.

Significantly, [J.H.] did not consult [C.G.] regarding educational or medical decisions, such as choosing and paying for preschool, activities, or selecting the child's doctor. Similarly, she was the one to schedule doctor appointments, child care, and coordinated extracurricular activities. While [C.G.] occasionally attended activities and appointments, or provided care, she did not have exclusive responsibility for the child or assume the role of a decision-maker for the child. The [c]ourt finds [J.H.] never encouraged [C.G.] to assume the status of parent to her child, nor did [C.G.]'s contributions amount to that of a parent.

Trial Ct. Op. at 7-8.

The court found that J.H. "paid for all aspects of the conception process." Trial Ct. Op. at 8. The parties "split household expenses," but J.H. purchased items needed specifically for J.W.H.'s well-being, including diapers, clothing, and food. *Id.* The court found: "The evidence presented does not establish [C.G.] assumed financial responsibility for the child. Instead, [C.G.] financially contributed to the household overall, and such contributions provided a tangential benefit to the child." *Id.*

Under the heading "Perception," the court found:

There is also a dispute regarding whether the parties held the child out to others as their child, rather than just [J.H.]'s child. Some witnesses perceived both parties to be parents of

- 7 -

the child, while others testified that only [J.H.] was a parent of the child. The child referred to [C.G.]'s parents as "Grampa Joe" and "Grandma Ann." [C.G.'s children] testified that they were told the child was their brother, though this is disputed by [J.H.]. The family would vacation and celebrate special occasions together, and send out a Christmas card as a family. These extended family members, however, have not reached out to the child since he moved to Pennsylvania with the exception of one birthday card. Such actions do not indicate a familial relationship; rather, it appears that such titles were created as a way for the child and [C.G.]'s family to easily refer to one another, and such interactions were incidental to [C.G.] and [J.H.] being in a relationship.

Trial Ct. Op. at 8.

Citing **S.A. v. C.G.R.**, 856 A.2d 1248, 1250 (Pa. Super. 2004), **appeal denied sub nom. Ash v. Roberts**, 877 A.2d 459 (Pa. 2005), the court looked for evidence of "strong psychological bonds" showing that C.G. "provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent." Trial Ct. Op. at 9. Noting that it did not receive the type of extensive bonding evidence that might be provided on the merits of a custody proceeding, the court nevertheless concluded that the record did "not establish a parent/child relationship exists between the child and [C.G.]." **Id.** The court found "that the child is well-adjusted to living in Pennsylvania with [J.H.], and that the child does not cry for, request to see, or otherwise reach out for [C.G.] as one would expect if a parent/child relationship was established between the child and [C.G.]." **Id.**

Finally, the court found:

Perhaps most telling that [C.G.] did not assume the role of a parent is her conduct post-separation. [J.H.] and the child moved to a separate residence in Florida in February of 2012,

after [C.G.] made them leave when the relationship ended. [C.G.] saw the child approximately once a week between February and July 2012, and would attend some of the child's extracurricular activities. Since July 2012, [C.G.] testified that she has only seen the child once, in March of 2014 when [J.H.] went to Florida, but has spoken to him on the phone occasionally. [C.G.] testified she has not paid any child support to [J.H.], but did pay for one week of science camp and one month of child care in 2012. Additionally, [C.G.] sends the child occasional care packages of little monetary value, yet maintains she has been willing to pay child support pursuant to a written agreement. Further, [C.G.] has not requested to be involved in educational, medical, or day-to-day decisions involving the child, and [C.G.] never requested copies of documents related to such things. Such minimal contact for nearly four years is not suggestive of a person who assumed parental status and discharged parental duties.

[C.G.] maintains [J.H.] used the child as leverage for a settlement on the house. [C.G.] acted under the impression that once she paid [J.H.] for her interest in the house, [J.H.] would allow her to see the child. The [c]ourt, however, is not convinced that [J.H.] withheld the child from [C.G.]. Rather, [J.H.] allowed occasional contact by phone, provided updates and photographs through email and text messages, and accepted nominal gifts from [C.G.]. [J.H.] describes these interactions as the same that she shared with her other friends, and as consistent with [C.G.]'s level of involvement in the child's life. [J.H.] even provided the opportunity for a face-to-face visit when they were in Florida in 2014. Conversely, [C.G.] never flew to Pennsylvania to visit the child or assist [J.H.] in the discharge of parental duties. Once [C.G.] and [J.H.] no longer resided together, [C.G.]'s financial contributions all but ended, as her prior contributions were mostly in the nature of household expenses. Therefore, the parties' conduct post-separation is consistent with the finding that [C.G.] was not a parent to the child.

Trial Ct. Op. at 9-10 (footnote omitted).

In the end, the trial court found that C.G. did not stand *in loco parentis* to J.W.H. It stated:

The testimony and evidence clearly indicates [C.G.] played a role in the child's early life, but the totality of the circumstances do not indicate that [C.G.] "stood in the shoes" of a parent. Rather, [C.G.] participated in minor activities and provided financial support incidental to living with [J.H.].

Trial Ct. Op. at 5. C.G. "did not assume key financial or caretaking parental duties or a decision-making role in the child's life." *Id.* at 10. Although the court acknowledged that around the time of J.W.H.'s birth, J.H. wrote two affectionate notes regarding the child and that C.G. made J.W.H. a beneficiary on her life insurance, the court concluded, "Two letters and one policy, coupled with [J.H.]'s testimony that [C.G.] never agreed to have a child, but merely tolerated the idea of [J.H.] having a child, do not establish [C.G.] as a mother to the child." *Id.* at 6. The court therefore sustained J.H.'s preliminary objection as to C.G.'s standing and dismissed C.G.'s complaint.

On October 17, 2016, C.G. filed a timely notice of appeal. She presents the following issues, as stated in her brief:

1. Did the [t]rial [c]ourt abuse its discretion and commit [an] error of law by failing to apply the correct legal standard in adjudicating [J.H.]'s Preliminary Objections to [C.G.]'s Complaint for Custody?

2. Did the [t]rial [c]ourt abuse its discretion and commit [an] error of law by finding [C.G.] had no in loco parentis standing to seek partial custody of the . . . child pursuant to 23 Pa.C.S. Section 5324(2)?

3. Did the [t]rial [c]ourt abuse its discretion and commit [an] error of law when it determined that the period of time between separation and [C.G.]'s Custody Complaint should be weighted significantly in determining the issue of standing?

4. Is [C.G.] a legal parent under 23 Pa.C.S. [§] 5324(1)?

C.G.'s Brief at 5.

## Standing as a Parent

For ease of disposition, we begin by taking C.G.'s fourth issue out of order, as it presents a pure question of law. C.G. contends that the trial court erred in finding that she did not have standing as J.W.H.'s parent under 23 Pa.C.S. § 5324(1). Although C.G. is not J.W.H.'s biological parent, she contends that she and J.H. jointly conceived and raised the child for six years, and that biology should not be the controlling factor in determining who is a parent.[3]

The trial court stated: "Both parties agree that at the time and place of the child's birth, [C.G.] was not considered a parent of the child because same-sex marriage and second parent adoption was not yet recognized in Florida in 2006.[4] As such, [C.G.] has never legally been viewed as a

_____

[3] In her statement of issues under Appellate Rule 1925(b), C.G. asserted that the trial court's finding that she was not J.W.H.'s parent "unconstitutionally restricts persons in a same-sex relationship from being able to reproduce and share legal parentage of a minor child." Pa.R.A.P. 1925(b) Statement at ¶ 3. In response, in its Rule 1925(a) opinion, the trial court said, "[I]n finding [C.G.] was not a parent to the child, the [c]ourt focused on her actions and/or lack of actions. This finding in no way unconstitutionally restricts persons in a same-sex relationship from being able to reproduce and share legal parentage." Pa.R.A.P. 1925(a) Op., 10/31/16, at 1. C.G. has not reasserted her constitutional argument in this Court.

[4] Second parent adoption became legal in Florida in 2010, before the parties separated. Trial Ct. Op. at 6. As the trial court found, C.G. made no effort to adopt J.W.H. after 2010.

parent to the child . . . ." Trial Ct. Op. at 3. Citing **J.A.L.**, the court noted that, under similar circumstances, Pennsylvania courts examine only whether the party seeking custody stood *in loco parentis* to the child. **Id.**[5]

This issue is one of statutory interpretation. "In evaluating a trial court's application of a statute, our standard of review is plenary and is limited to determining whether the trial court committed an error of law." **Commonwealth v. McFadden**, 156 A.3d 299, 305 (Pa. Super. 2017) (citation omitted).

The Child Custody Law confers standing on a "parent of the child," but does not define "parent." **See** 23 Pa.C.S. § 5324(1). Pennsylvania courts have interpreted "parent" to include only biological parents and adoptive parents. **See T.B. v. L.R.M.**, 786 A.2d 913, 916 n.6 (Pa. 2001) ("Persons other than biological parents are 'third parties' for purposes of custody disputes" (citation omitted)); **Faust v. Messinger**, 497 A.2d 1351, 1353 (Pa. Super. 1985) (noting that after adoption, child attains status of natural child of adoptive parents). Thus, in **T.B.**, the Supreme Court addressed only whether the biological mother's former life partner (who did not adopt the child) had *in loco parentis* status, not whether she was a parent. **T.B.**, 786 A.2d at 916. Similarly, in **J.A.L.**, we stated that a biological mother's former life partner could be granted standing, "if at all, only as a third party who

_____

[5] As J.H. and C.G. were not married when J.W.H. was born (or thereafter), we need not consider here the parental status of the same-sex spouse of a biological mother.

- 12 -

has stood in loco parentis to [the biological mother's] child." ***J.A.L.***, 682 A.2d at 1321.

C.G. does not cite any statute or case law establishing that a former life partner who has no biological relationship to the child and has not adopted the child can be a "parent to the child" under 23 Pa.C.S. § 5324(1). Moreover, our case law has consistently treated same-sex life partners who have not adopted a child as third parties for purposes of custody matters. ***See T.B.***, 786 A.2d at 916 n.6; ***J.A.L.***, 682 A.2d at 1321. Accordingly, we conclude that under our case law, the trial court did not err in finding that C.G. lacked standing as a parent under Section 5324(1), particularly since the parties had agreed that C.G. was not a parent when the child was born.

### Standing Through *In Loco Parentis* Status

C.G.'s remaining issues relate to the trial court's determination that she does not stand *in loco parentis* to J.W.H. and therefore lacks standing on that basis. The Child Custody Law confers standing on "[a] person who stands in loco parentis to the child." 23 Pa.C.S. § 5324(2). "The phrase '*in loco parentis*' refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption." ***T.B.***, 786 A.2d at 916-17.

The trial court found that C.G. was not *in loco parentis* to J.W.H. following its extensive review of the evidence presented at an evidentiary hearing. In ***T.B.***, our Supreme Court instructed:

> The scope of review applied by an appellate court to a child custody order is of the broadest type; the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that is not supported by competent evidence. However, this broad scope of review does not vest an appellate court with the duty or privilege of making its own independent determination. An appellate court may not interfere with the trial court's factual conclusions unless they are unreasonable in view of the trial court's factual findings and thus represent an abuse of discretion.

786 A.2d at 916 (citations omitted). This scope of review applies to trial court decisions regarding standing. *See id.*; *J.F. v. D.B.*, 897 A.2d 1261, 1273 (Pa. Super.), *appeal denied*, 909 A.2d 1290 (Pa. 2006); *see also Silfies v. Webster*, 713 A.2d 639, 642 (Pa. Super. 1998); *J.A.L.*, 682 A.2d at 1318. In this connection, we note that, "[o]n factual matters, the hearing judge is far better able to assess credibility and weight of testimony than" an appellate court. *Reilly v. Reilly*, 280 A.2d 639, 640 (Pa. Super. 1971). "[T]he ultimate test is 'whether the trial court's conclusions are unreasonable as shown by the evidence of record.'" *Silfies*, 713 A.2d at 642 (quoting *Moore v. Moore*, 634 A.2d 163, 168 n.4 (Pa. 1993)).

*Legal Standard Governing Determination of Standing*

In her first issue, C.G. contends that the trial court applied the wrong legal standard in evaluating her claim to standing. Whether an incorrect legal standard was applied is a question of law, and thus our standard of review is *de novo*. *Braun v. Wal-Mart Stores, Inc.*, 106 A.3d 656, 663 n.8 (Pa. 2014), *cert. denied*, 136 S. Ct. 1512, 194 L. Ed. 2d 602 (2016).

C.G. concedes that "if preliminary objections challenge the 'factual accuracy' of the complaint leading to the objections, the [c]ourt may hold a hearing to resolve the factual disagreements." C.G.'s Brief at 14-15. Thus, she agrees that when she claimed to have standing because she is *in loco parentis* to J.W.H., the trial court properly held a factual hearing to resolve J.H.'s preliminary objection to that contention. ***See id.*** at 18 (acknowledging that trial court's decision to hold a hearing was not an abuse of discretion or error of law). However, C.G. argues that J.H.'s preliminary objections could be sustained only if it was "'clear and free from doubt' from all of the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish [her] right to relief." ***Id.*** at 15, 19. Though not entirely clear, C.G. thus appears to argue that the "clear and free from doubt" standard restricted the ability of the trial court to resolve factual disputes adversely to her claim of standing, even though the court held a factual hearing. In support of her argument, C.G. cites cases that were decided on the pleadings and in which no evidentiary hearing was held. ***See Bower v. Bower***, 611 A.2d 181, 183 (Pa. 1992) (resolving demurrer that turned on a pure question of law); ***Firing v. Kephart***, 353 A.2d 833, 835 (Pa. 1976) (resolving demurrer that involved "no factual dispute," but "only a dispute over the interpretation of the Constitution").[6] C.G. also argues

_____

[6] C.G. also cites ***Butler v. Illes***, 747 A.2d 943 (Pa. Super. 2000). There was no evidentiary hearing in that case; the child's aunt, who was seeking custody, conceded that she did not stand *in loco parentis*. ***Id.*** at 945-46.

that it was error for the trial court to defer hearings on the merits of her custody claim until the court decided whether she had standing. C.G.'s Brief at 17-18.

In her response, J.H. points out preliminarily that C.G. did not challenge the legal standard applied by the trial court in her statement of issues under Appellate Rule 1925(b),[7] and J.H. contends that C.G. therefore waived this issue. **See generally** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement . . . are waived"); **Commonwealth v. Hill**, 16 A.3d 484, 494 (Pa. 2011) ("any issues not raised in a Rule 1925(b) statement will be deemed waived"). However, to resolve the other issues presented by C.G. in this appeal, all of which relate to whether the trial court properly held that C.G. lacks standing to maintain her custody action, we necessarily must consider the appropriate legal standard that applies to such a claim. This is especially true with respect to C.G.'s second appellate issue

---

[7] C.G.'s Rule 1925 Statement raised the following issues:

1. The Trial Court abused its discretion when it found that [C.G.] did not have in loco parentis standing to pursue custody rights to the minor child, and thereafter dismissed her Custody Complaint.

2. The Trial Court committed an abuse of discretion and error of law when it found that [C.G.] was not a parent to the minor child at issue.

3. The Trial Court committed an abuse of discretion and error of law when it found that [C.G.] was not a parent to the minor child at issue, because such a finding unconstitutionally restricts persons in a same-sex relationship from being able to reproduce and share legal parentage of a minor child.

(the first issue listed in her Rule 1925(b) Statement), which asks whether the trial court erred when it held that C.G. is not *in loco parentis* to J.W.H. Matters listed in a Rule 1925(b) Statement "will be deemed to include every subsidiary issue contained therein which was raised in the trial court." Pa.R.A.P. 1925(b)(4)(v). We therefore decline to find this issue waived.

J.H.'s preliminary objections coupled a Pa.R.Civ.P. 1028(a)(5) objection to C.G.'s standing ("capacity to sue") with a demurrer under Rule 1028(a)(4). **See** Defendant's Prelim. Objs. ¶ 13 ("[J.H.] hereby raises a demurrer to [C.G.]'s claims, and seeks dismissal of this action pursuant to Pa.R.C.P. 1028(a)(4) and (5), on the basis that [C.G.] fails to state a claim upon which relief can be granted and lacks standing to bring an action for legal or physical custody of the child"). Because standing goes to a party's capacity to sue, a standing objection is properly raised by an objection under Rule 1028(a)(5). **See generally K.W. v. S.L.**, 157 A.3d 498, 504 (Pa. Super. 2017) (addressing standing issue raised under Rule 1028(a)(5)); **Kellogg v. Kellogg**, 646 A.2d 1246, 1250 (Pa. Super. 1994) ("a party to a civil suit raises a claim that an opposing party has no capacity to sue by way of preliminary objection [under] Pa.R.C.P. 1028(a)(5)"). Accordingly, the trial court addressed J.H.'s standing issue as a capacity objection and, once it ruled in J.H.'s favor on that basis, dismissed J.H.'s demurrer as moot.

In ruling on these issues, the trial court properly noted the distinction between a demurrer, which raises only a question of law, and an objection to standing that turns on resolution of fact questions:

"[P]reliminary objections in the nature of a demurrer require the court to resolve issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered to dispose of the legal issues presented by a demurrer." **Morley v. Gory**, 2002 PA Super. 421, 814 A.2d 762, 764 [(Pa. Super. 2002)] (citation omitted). Standing, however, is "a necessary threshold issue which must be determined before proceeding to the central question in the underlying custody action regarding who should exercise custody over Child." **K.C. v. L.A.**, [128 A.3d 774, 779 (Pa. 2015)] (citation omitted). . . . [I]t is proper for a court to hear testimony and admit other evidence into the record in order to determine a preliminary objection as to standing.

Trial Ct. Op. at 2-3 (some formatting altered). This distinction is critical to C.G.'s first issue. While standing issues sometimes can turn on pure questions of law,[8] they more commonly turn on questions of fact. When they do, Rule 1028(c)(2) governs their disposition: "If an issue of fact is raised, the court shall consider evidence by depositions or otherwise." Pa.R.Civ.P. 1028(c)(2). This rule mandates that the court resolve factual disputes by hearing evidence, rather than making a non-evidentiary judgment on the basis of the disputed factual allegations: "The trial court may not reach a determination based upon its view of the controverted facts, but must resolve the dispute by receiving evidence thereon through interrogatories, depositions, or an evidentiary hearing." **Am. Hous. Tr., III**

---

[8] C.G.'s claim to standing as J.W.H.'s parent is one such example. **See also, e.g.**, **D.P. v. G.J.P.**, 146 A.3d 204, 217 (Pa. 2016) (rejecting grandparents' standing claim as matter of law because statute purporting to confer standing was unconstitutional); **K.W.**, 157 A.3d at 504-07 (rejecting prospective adoptive parents' standing claim as matter of law because it was undisputed that biological parent had not expressly consented to their *in loco parentis* status).

*v. Jones*, 696 A.2d 1181, 1185 (Pa. 1997) (citation omitted). When, as here, a trial court holds such an evidentiary hearing, it must weigh the evidence and make credibility determinations to resolve any conflicts in the testimony. *See, e.g.*, *T.B.*, 786 A.2d at 919 (approving of trial court's resolution of standing question and stating, "Although the parties gave conflicting versions of what role Appellee played in [the child]'s life, the hearing officer resolved questions of credibility in Appellee's favor").

As the trial court observed, this hearing procedure is fundamentally different from what happens on a demurrer. A demurrer tests only whether, as a matter of law, the pleaded allegations may entitle the pleader to relief. To answer that question, the pleader's factual allegations are accepted as true; because there are no other "facts" before the court, the trial court has no basis to assume otherwise. And because neither party has had any opportunity to present evidence showing what the facts actually are, the law precludes dismissal unless it is "clear and free from doubt" that no relief may be obtained under the pleader's allegations. *See generally Firing*, 353 A.2d at 834-35; *Mellon Bank, N.A. v. Fabinyi*, 650 A.2d 895, 899 (Pa. Super. 1994).

But once each side's evidence has been presented at a hearing, the pleaded facts no longer are determinative; it is the actual *proof* that counts. The hearing will determine what the facts actually are. Therefore, on preliminary objections that require a factual hearing, the plaintiff's factual allegations no longer are presumed to be true and there is no longer any

need to give the plaintiff the benefit of any doubt about its case. Those doubts will have been resolved. Therefore, C.G.'s position that after holding the factual hearing on standing, the trial court still was required to rule in C.G.'s favor so long as she presented a colorable claim to standing that could survive the "clear and free from doubt" standard applicable to a demurrer is incorrect. The purpose of a hearing is to replace the colorable claim with decided facts and thereby to make the facts of the case clear and free from doubt.

Such a definitive resolution by a hearing is especially important when the preliminary objections present a standing issue regarding whether a putative custody plaintiff has *in loco parentis* status. Recognition of that status confers on the plaintiff a *prima facie* claim to custody. **McDonel v. Sohn**, 762 A.2d 1101, 1106 (Pa. Super. 2000), **appeal denied**, 782 A.2d 547 (Pa. 2001). It thus grants that plaintiff a colorable claim to an increased role in the child's life, one that the child's parent may not welcome. Pennsylvania law therefore calls for *in loco parentis* issues to be determined early, and carefully. The Supreme Court has explained:

> [W]henever there are contested issues relating to standing, the [Child Custody Law] gives parents the ability to bifurcate the proceedings by seeking dismissal for lack of standing, thereby requiring that any such preliminary questions be resolved before the complaint's merits are reached.
>
> The potential for such bifurcation serves an important screening function in terms of protecting parental rights. As suggested, it facilitates early dismissal of complaints, thereby relieving families of the burden of litigating their merits where a sufficient basis for standing is absent.

*D.P. v. G.J.P.*, 146 A.3d 204, 213 (Pa. 2016).  As part of this process, the Supreme Court has established "a stringent test for standing in third-party suits for visitation or partial custody due to the respect for the traditionally strong right of parents to raise their children as they see fit."  *T.B.*, 786 A.2d at 916 (footnote omitted).  The Court has emphasized, "[*i*]n loco parentis is a legal status and **proof of essential facts is required to support a conclusion that such a relationship exists**."  *Id.* (emphasis added).

Thus, where there is a preliminary objection to standing in a custody case and the trial court holds an evidentiary hearing, the objection may be overruled only if the party claiming standing **proves**[9] that she has *in loco parentis* status or some alternative basis for standing.  **See Morgan v. Weiser**, 923 A.2d 1183, 1187 (Pa. Super.), **appeal denied**, 932 A.2d 1289 (Pa. 2007); **Liebner v. Simcox**, 834 A.2d 606, 609 (Pa. Super. 2003).  Mere presentation of averments stating a colorable claim to standing is insufficient, for the question before the court is not, as C.G. argues, whether the plaintiff has pleaded facts that might entitle her to claim *in loco parentis* status, but rather whether she has **proved** that she has that status.

---

[9] In **Kellogg**, 646 A.2d at 1249-50, we stated that standing must be proven by clear and convincing evidence.  **Accord McNamara v. Thomas**, 741 A.2d 778, 780 (Pa. Super. 1999); **MacDonald v. Quaglia**, 658 A.2d 1343, 1344 (Pa. Super. 1995).  The Supreme Court has not addressed that question, and we have not revisited it in our more recent case law.  Because the trial court made no mention of a clear and convincing standard when it found that C.G. lacked standing and because C.G. has not raised the burden of proof as an issue in her appeal, we have no occasion to consider that question here.

Indeed, if the rule were otherwise, it would be difficult to understand why any hearing to establish standing would be needed at all, and a plaintiff could obtain the colorable claim to custody that standing confers merely by making a colorable claim to have standing. The requirement of standing would have little meaning if it could be obtained merely by claiming it, rather than proving it.

Here, the trial court did not merely look to see if C.G. made allegations of standing that could withstand attack under the "clear and free from doubt" test. Instead, it held a hearing, made findings about disputed facts, and resolved C.G.'s claim to standing on the basis of its findings. That is precisely what it was required to do, and the trial court thus did not err.

The foregoing discussion also disposes of C.G.'s argument that the trial court should not have deferred consideration of the merits of her custody claim until it decided the standing question. C.G. apparently contends that if the trial court had determined only whether she made a colorable claim to standing, the court could have proceeded to the merits of the custody case and then decided her standing and the merits of her custody claim together. *See* C.G.'s Brief at 17-18. But as the Supreme Court explained in ***D.P.***, 146 A.3d at 213, because standing is a threshold issue, it should not normally be bypassed in that fashion. Although there may be some situations in which the facts relating to standing are so fluid that the trial court may be unable to make a definitive decision about it before hearing other issues, there has

been no showing that this was such a case.[10]  The trial court did not abuse its discretion in resolving the standing question first.

For all of these reasons, C.G.'s first claim of error is without merit.

### *The Finding That C.G. Was Not* In Loco Parentis

In her second issue, C.G. argues that the trial court erred in concluding that she lacked *in loco parentis* status.  She contends that the evidence proved she acted as a co-parent to the child and that the trial court abused its discretion by "either disregard[ing] or minimiz[ing] evidence" that she acted as a parent to the child and "minimiz[ing] the family structure the minor child resided in for a period of six years."  C.G.'s Brief at 26.  Under *T.B.*, 786 A.2d at 916, we "may not interfere with the trial court's factual

_____

[10] C.G.'s reliance on **Kellogg** to support her argument is misplaced. **Kellogg** was an early standing case that addressed the issue in light of a decided lack of precedents.  **See** 646 A.2d at 1249-50.  At the time, Rule of Civil Procedure 1915.5 did not include a deadline for raising a standing objection, though it did say that objections to jurisdiction and venue should be made within 20 days after a complaint was filed; it also said that any "other pleading . . . shall not delay the hearing" on custody.  The Court suggested that a standing objection also should be made within the first 20 days, but that, in light of the "shall not delay" language of the rule, the custody hearing could go forward on the merits while the standing objection was pending.  **Id.** at 1250.  When **Kellogg** was decided, the Court did not have the benefit of Supreme Court decisions like **D.P.** and **T.B.** that emphasize the need for early resolution of the standing question.  The case also was decided before promulgation of the 2014 amendment to Rule 1915.5 that explicitly requires a standing objection to be made within 20 days and no longer makes a standing objection an "other pleading" that may not delay the custody hearing.  In our most recent discussion of **Kellogg**, we stated, "While standing in custody cases may be fluid under some circumstances, it certainly cannot be asserted at any time" and should be asserted within 20 days.  **M.G. v. L.D.**, 155 A.3d 1083, 1087 n.5 (Pa. Super. 2017), **appeal denied**, Nos. 148 MAL 2017, 149 MAL 2017 (Pa., May 12, 2017).

conclusions unless they are unreasonable in view of the trial court's factual findings and thus represent an abuse of discretion."

The Supreme Court has explained that "the status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties." *T.B.*, 786 A.2d at 916-17. "Parental duties" include "meeting the physical, emotional and social needs of the child." 23 Pa.C.S. § 5322. "[T]he showing necessary to establish in loco parentis status must in fact be flexible and dependent upon the particular facts of the case." *J.A.L.*, 682 A.2d at 1320.

In *T.B.*, the trial court found that a same-sex partner, T.B., had *in loco parentis* standing to the child at issue, A.M. This Court and the Supreme Court of Pennsylvania affirmed. In its opinion, the Supreme Court deferred to the trial court's factual findings because the record supported them. *T.B.*, 786 A.2d at 919. Those findings included that the parties "engaged in an exclusive, intimate relationship," "shared finances and expenses," "jointly purchased a home," "decided to have a child," and "agreed that [the biological mother, L.R.M.] would be impregnated by a sperm donor and that [T.B.] would choose the donor." *Id.* at 914-15 (footnote omitted). T.B. "cared for [L.R.M.] during her pregnancy and attended childbirth classes with her[, and] was the designated co-parent for purposes of being present in the operating room during the birth." *Id.* at 915. After the child was born, the parties lived together with the child but did not enter into a formal parenting agreement. *Id.* L.R.M. named T.B. as guardian of the child in her

will. *Id.* L.R.M. and T.B. "shared day-to-day child rearing responsibilities, including taking [the child] for medical check-ups and other appointments." *Id.* T.B. "was active, yet deferential to [L.R.M.] in making parental decisions." *Id.* Accepting the trial court's findings, the Court agreed that T.B. stood *in loco parentis* and had standing to seek partial custody. *Id.* at 919-20.

In *J.A.L.*, this Court reversed a trial court ruling that a same-sex partner, J.A.L., lacked *in loco parentis* standing with respect to the child there at issue, G.H. *J.A.L.*, 682 A.2d at 1316. We stated that "[t]he facts as found by the trial court clearly indicate that [the biological mother,] E.P.H. and J.A.L. lived together . . . as a nontraditional family, for many years before the birth of the child" and that the child "was to be a member of their nontraditional family." *Id.* at 1321. Those facts included: "the parties agreed that E.P.H. would be artificially inseminated to attempt to conceive a child whom the parties would raise together"[;] the parties selected a sperm donor together; J.A.L. performed the inseminations; J.A.L. accompanied E.P.H. to doctor visits and childbirth classes; J.A.L., along with two other friends of E.P.H., was present at the birth of the child; and the child was given J.A.L.'s surname as a middle name. *Id.* at 1316. In addition, before the child's birth, the parties consulted an attorney who drafted documents, including "a Nomination of Guardian in which E.P.H. named J.A.L. as the guardian of the child in the event of E.P.H.'s death or disability"; "an Authorization for Consent to Medical Treatment of Minor,

- 25 -

permitting J.A.L. to consent to medical or dental treatment of the child[;]" "a Last Will and Testament for each party, providing for the other party and the child[,]" and, in E.P.H.'s will, a clause appointing J.A.L. as the guardian of the child; and a co-parenting agreement. *Id.* at 1316-17. The parties executed all of these documents except for the co-parenting agreement, which J.A.L. refused to execute after counsel advised the parties that the agreement was not enforceable in Pennsylvania. *Id.* at 1317. After the child's birth, the parties lived together with the child, and J.A.L. "assisted with all aspects of the care of the baby." *Id.* After the parties separated, J.A.L. visited the child frequently and regularly. *Id.* at 1317, 1322.

Here, the trial court heard extensive conflicting testimony regarding the role that C.G. played in the child's life. After hearing this evidence, the court made several findings that led it to conclude that C.G. did not stand *in loco parentis* to J.W.H. Among these were that: the parties "took no steps to formalize a co-parenting arrangement" and neither party suggested adoption after adoption by members of a same-sex couple became a legal option in Florida in 2010; C.G. "never agreed to have a child, but merely tolerated the idea of [J.H.] having a child"; although C.G. initially carried the child on her medical and dental insurance, she removed him from her policies after the parties separated; C.G. was not listed as a parent on school or medical documents and was not intended to be the child's guardian if something happened to J.H.; C.G. acted as a babysitter (according to J.H., she sometimes refused to care for the child), and some witnesses

- 26 -

characterized her interactions with the child "as playing, not parenting"; J.H. did not consult C.G. regarding educational or medical decisions, including preschool selection, doctor selection or appointments, child care, and the child's activities; C.G. did not "assume the role of a decision-maker for the child" or make contributions amounting to that of a parent; while C.G. contributed financially to the household, she did not assume financial responsibility for the child; C.G.'s extended family members have not reached out to the child since the parties' separation; "the evidence presented does not establish a parent/child relationship exists between the child and [C.G.]," and "the child does not cry for, request to see, or otherwise reach out for [C.G.]"; and "the parties' conduct post-separation is consistent with the finding that [C.G.] was not a parent to the child." Trial Ct. Op. at 5-10. The trial court resolved issues of credibility in favor of J.H., and the record supports its findings.[11]

The court's holding rests on the unique facts of this case, and there are significant distinctions between this case and ***T.B.*** and ***J.A.L.***, the main decisions on which C.G. relies. For example, in ***T.B.*** and ***J.A.L.***, the parties decided together to have a child; here, the court credited J.H.'s testimony that C.G. "never agreed to have a child, but merely tolerated the idea of

---

[11] The trial court acknowledged two handwritten notes from J.H. to C.G. and C.G.'s life insurance policy, on which she identified the child as her son. The court weighed this evidence against the other evidence in the case and concluded that it did not establish that C.G. assumed a role of mother to J.W.H. Trial Ct. Op. at 6. The court did not abuse its discretion in making that determination.

[J.H] having a child." Trial Ct. Op. at 6. Moreover, unlike the parties seeking custody in *T.B.* and *J.A.L.*, C.G. did not participate in educational or medical decisions regarding the child, was not intended to be the child's guardian if something happened to J.H., and acted more like a babysitter than a parent. *Id.* at 7-8. Further, there were no formal documents indicating a co-parenting arrangement, the child did not bear C.G.'s surname, and C.G. did not visit the child frequently and regularly after the parties separated. *Id.* at 5-6, 9-10.

The trial court's opinion reflects a careful, thorough, and proper consideration of the evidence presented by **both** parties, and did not, as C.G. alleges, simply disregard the evidence in her favor. Faced with conflicting testimony regarding C.G.'s role in the child's life, the trial court acted well within its discretion in resolving those conflicts in favor of J.H. Because the record supports the trial court's findings and the trial court's conclusions are reasonable, we affirm its holding that C.G. lacked *in loco parentis* status. **See T.B.**, 786 A.2d at 916.

### Consideration of Post-Separation Conduct

In her remaining issue, C.G. contends that the trial court abused its discretion by giving too much weight to the parties' post-separation conduct in determining the issue of standing. C.G. relies on the principle that "once standing to sue for custody has been obtained, it does not 'vanish' or somehow 'atrophy.'" C.G.'s Brief at 30.

In ***J.A.L.***, we considered, among other factors, the post-separation conduct of the parties when addressing the issue of standing. ***See J.A.L.***, 682 A.2d at 1322. Specifically, we noted that J.A.L.'s early contact with the child "was reinforced by visits after the parties' separation, visits which occurred with a frequency and regularity similar to that of post-separation visits by many noncustodial natural parents and thus must be considered adequate to maintain any bond previously created." ***Id.*** We held that the evidence, including the evidence of post-separation conduct, "clearly established that J.A.L. has shown a constant, sincere interest in the child, and that the child recognizes J.A.L. as a significant person in her life." ***Id.*** Here, as in ***J.A.L.***, it was proper for the trial court to consider the parties' post-separation conduct, along with evidence regarding their pre-separation conduct, in determining whether C.G. had a similar "constant, sincere interest" in J.W.H. and therefore stood *in loco parentis* to the child.

In support of her argument, C.G. relies on ***Grom v. Burgoon***, 672 A.2d 823 (Pa. Super. 1996), but we find that decision inapposite. In ***Grom***, we held that the trial court erred in finding that a grandmother lost standing because she did not file a petition for visitation rights until three years after the child moved out of her home. 672 A.2d at 825. We relied on the language of the statute conferring standing on grandparents, which contained no time limit for seeking visitation. ***Id.*** ***Grom*** has no bearing on

this case because the trial court did not hold that C.G. lacked standing because she did not seek custody of the child earlier.[12]

This is not a case in which the trial court found that C.G. lost standing that she once had. Rather, this is a case in which the trial court properly viewed all of the relevant evidence before it, including that regarding the parties' pre- and post-separation conduct, to determine whether C.G. ever stood *in loco parentis* to J.W.H. **See J.A.L.**, 682 A.2d at 1322. Upon doing so, the trial court found that C.G. did not have standing. We defer to the trial court to assess the weight of the evidence. **See Reilly**, 280 A.2d at 640. We conclude that the trial court did not abuse its discretion in doing so in this case.

---

[12] We also find our holding regarding post-separation conduct in **Liebner**, 834 A.2d at 611, inapposite. We held in that case that it was error to consider the parties' post-separation conduct to conclude that a party that had gained *in loco parentis* status could then lose it. Here, however, the trial court did not hold that C.G. had *in loco parentis* status and then lost it after she separated from J.H.; rather, the court found that the parties' post-separation conduct was "consistent with the finding that [C.G.] was not a parent to the child" and thus never had *in loco parentis* status. Trial Ct. Op. at 10.

For the foregoing reasons, we affirm the trial court's order.

Judge Moulton joins the opinion.

Judge Musmanno files a concurring opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/11/2017