J-S82029-17

2018 PA Super 50

| | | |
|---|---|---|
| A.J.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| A.G.B. | : | |
| ***************************** | : | |
| D.K. | : | No. 1164 WDA 2017 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| A.B. AND A.G.B. | : | |
| | : | |
| | : | |
| APPEAL OF: A.M.G. | : | |

Appeal from the Order Entered July 31, 2017
In the Court of Common Pleas of Cambria County Civil Division at No(s):
No. 2016-2996, No. 2017-941

BEFORE:   BENDER, P.J.E., STEVENS, P.J.E.*, and STRASSBURGER, J.**

OPINION BY STEVENS, P.J.E.:                              FILED MARCH 7, 2018

Appellant, A.M.G. ("Ex-Wife"), files this appeal from the Order dated

July 7, 2017, and entered July 31, 2017,[1] in the Cambria County Court of

_____

[1] The subject order was dated July 7, 2017. However, the clerk did not provide notice pursuant to Pa.R.C.P. 236(b) until July 31, 2017. Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)." Pa.R.A.P. 108(b). Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." Frazier v. City of Philadelphia, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999).

_____

*   Former Justice specially assigned to the Superior Court.
** Retired Senior Judge assigned to the Superior Court.

Common Pleas, granting A.J.B.'s ("Mother") Motion to Strike Co-Defendant

[Ex-Wife] for Lack of Standing, and granting D.K.'s ("Father") Motion to Vacate

Order and Mother's Petition to Vacate Consent Order.  After review, we affirm

in part, and vacate and remand in part.

The trial court summarized the relevant procedural and factual history

as follows:

PROCEDURAL HISTORY

This matter involves two cases and three pleadings, which the trial court consolidated for hearing:

DIVORCE ACTION (DOCKET NO. [])

In the first case (Docket No. []), A.J.B. ["Mother"] filed a Complaint in Divorce against A.M.B., now A.M.G. ["Ex-Wife"], on August 12, 2016 [()"divorce action"[)].  Although Mother's Complaint did not include a claim for custody, Mother and Ex-Wife nonetheless filed a Consent Order for Custody [()"Consent Order"[)] regarding a minor child, D.H.B. (born November [] 2015) [()"Child"[)].  The trial court executed the Consent Order on August 15, 2016.  Pursuant to the Consent Order, Mother and Ex-Wife shared legal custody; Mother exercised primary physical custody; and Ex-Wife had partial custody every weekend, shared holidays, and at other times as mutually agreed.

On April 21, 2017, Father filed a Motion to Vacate Order in the divorce action.  On April 24, 2017, Mother filed a Petition to Vacate Consent Order for Custody.

CUSTODY ACTION (DOCKET NO. [])

In the second case (Docket No. []), [Father] filed a Complaint for Physical Custody and Shared Legal Custody against Mother and Ex-Wife on March 13, 2017 [()"custody action"[)].  On April 17, 2017, Mother filed a Motion to Strike Co-Defendant for Lack of Standing.

PROCEEDINGS

The trial court consolidated the cases for hearing and scheduled summary proceedings for June 19, 2017.[2] The trial court scheduled the matter for an additional full-day hearing on July 7, 2017.[3] The trial court rendered a decision from the bench at the conclusion of the hearing. The trial court filed an Order confirming its decision on July 31, 2017.[4] Ex-Wife filed a Notice of Appeal and a Concise Statement of Matters Complained of on Appeal on August 7, 2017.[5] . . .

<u>FINDINGS OF FACT</u>

The [c]ourt makes the following Findings of Fact:

. . .

3.  Mother had a romantic and sexual relationship with [Ex-Wife] that led to marriage and culminated in divorce.

. . .

5.  Beginning April 6, 2009, Mother and Ex-Wife dated while Ex-Wife was in high school. Ex-Wife was 15 years old when she began to date Mother; Mother was 20.

6.  In 2011, Mother and Ex-Wife began to reside together.

_____

[2] The Notes of Testimony for this proceeding are not included as part of the certified record.

[3] Mother, Father, and Ex-Wife were all present at the hearing and represented by counsel. All testified on their own behalf. Additionally, Ex-Wife presented the testimony of a friend, J.L.

[4] In the interim, Ex-Wife filed a Motion for Reconsideration/Motion for Court Intervention in Custody Reduction Schedule/Motion for Final Order on July 27, 2017. By Order dated and entered August 2, 2017, the court, in relevant part, denied the Motion for Reconsideration and determined the Motion for Final Order moot as a result of the subject order of the instant appeal dated July 7, 2017, and entered July 31, 2017.

[5] Ex-Wife filed a revised Notice of Appeal on September 5, 2017, to correct the caption.

7.     On March 15, 2013, Mother and Ex-Wife developed a plan to conceive a child.  Mother and Ex-Wife determined that Mother would carry the child.  Mother chose men to engage in three-way sex with her and Ex-Wife.  The men ejaculated in Mother.  Some of the men knew they were being used as sperm donors; others did not.  Mother did not become pregnant after approximately one year of following this protocol.

8.     Between February 2014 and February 2015, Mother and Ex-Wife were not in a relationship.

9.     From March 2014 to January 2015, Mother had a romantic relationship with [Father] that included sexual intercourse. Mother and Father also had sexual relations around Mother's birthday (January 27, 2015) through mid-February 2015 during an unsuccessful reconciliation attempt.[6]

10.     During Mother's relationship with Father, Mother did not believe she could become pregnant.

11.     Mother did not intend for Father to impregnate her so she could raise the child with Ex-Wife.

12.     On January 25, 2015, Mother had sexual relations with a male, D.F., in Clarion, Pennsylvania.  D.F. was not one of the men used for the purpose of conception.

. . .

14.     In February 2015, Mother and Ex-Wife met for lunch to discuss reconciliation.  That night, Mother sent Ex-Wife a photo of a positive pregnancy test.  The next day, Mother took three more pregnancy tests in Ex-Wife's presence.  All were positive.

15.     About two weeks after their luncheon meeting, Mother and Ex-Wife moved in together.

16.     Mother's doctor calculated the date of conception to be January 29, 2015.

17.     Mother and Ex-Wife were not in a monogamous relationship at the time of Child's conception.

---

[6] Critically, Mother testified that she and Father had sexual relations approximately the second weekend of February.  N.T. at 50, 170-71, 175.

18. Initially, Mother did not believe Father could be Child's parent based on the date of conception.

19. Father . . . learned Mother was pregnant. Mother advised Father that "the dates didn't match up to the time [Father] had intercourse with [Mother]." Father reasonably believed he was not Child's father at this time.

20. On April 14, 2015, Mother and Ex-Wife legally married.

21. After their marriage[,] but prior to Child's birth, Mother and Ex-Wife consulted an attorney regarding termination of parental rights for D.F., whom Mother and Ex-Wife believed to be Child's father. Neither Mother nor Ex-Wife followed through with legal action.

22. Mother gave birth to Child [in] November [of] 2015.

23. Mother and Ex-Wife are both listed on Child's birth certificate as parents.

24. Ex-Wife chose Child's first name; Mother and Ex-Wife jointly selected Child's middle name.

25. Ex-Wife served as the sole source of financial support for Mother and Child for approximately six weeks after Child's birth when Mother was on maternity leave.

26. From Child's birth until December 16, 2015, Mother and Ex-Wife intended to "raise the child together in a happy marriage...." The parties shared day-to-day childcare duties during this time.

27. The marriage lasted approximately five to six weeks after Child was born. On December 16, 2015, Mother learned that [Ex-Wife] was having an affair; and the parties separated. (The parties memorialized the date of separation in a Marriage Settlement Agreement filed on August 12, 2016.)

28. After separation, Mother refused Ex-Wife's offers of support. Mother did not file a complaint for support against Ex-Wife.

29. On January 21, 2016, D.F. participated in a store-bought paternity test. By report dated February 3, 2016, D.F. was "excluded as the biological father of [Child]."

30. In March of 2016, Mother approached Father and advised him that D.F. had failed the paternity test. Father took a store-bought paternity test, which indicated he was not Child's father.

31.    Ex-Wife continued to reside at the home, mostly separate and apart from Mother, from December 16, 2015, to April 2016.[7]

32.    Between December 16, 2015, and April 2016, Ex-Wife's contact with Child was impacted by working an overnight shift, attending college classes, and staying with a male friend.  Ex-Wife continued to perform routine parenting duties for Child when she (Ex-Wife) was available.[8]

33.    In April 2016, Ex-Wife moved out of the home she shared with Mother.

34.    Between April 2016 and August 2016, Ex-Wife had contact with Child initially for a few hours per week, then on Wednesdays and every weekend.

35.    Mother received and relied upon legal advice from a competent attorney that Ex-Wife was entitled to custody because Child was born during their marriage.

36.    Ex-Wife presented credible testimony that Mother agreed to Ex-Wife's weekend custody in exchange for Mother receiving the marital residence in equitable distribution.

37.    On August 12, 2016, Mother filed for divorce.

38.    On or about August 15, 2016, Mother and Ex-Wife executed a Consent Order for Custody.[9]  Pursuant to the Order, Mother and Ex-Wife shared legal custody; Mother exercised primary physical custody; and Ex-Wife had partial custody every weekend (Friday at 5:00 P.M. to Monday at 12:00 P.M.), shared holidays, and other times by mutual agreement.

39.    Neither Mother nor Ex-Wife notified Father of the Consent Order.

_____

[7] Ex-Wife disputed Mother's characterization of their interaction while Ex-Wife remained in the home.  N.T. at 81.

[8] Mother disputed the nature and extent of Ex-Wife's involvement with Child prior to her leaving the marital home.  N.T. at 13.

[9] The trial court notes that "[i]t is the trial court's policy to approve and execute consent orders that contain executed joinders without requiring the parties to appear in court."  Trial Court Opinion ("T.C.O."), 9/15/17, at 2 n.4.

40.     Ex-Wife attended to Child's day-to-day needs during her custody periods.     Ex-Wife also attends Child's doctor appointments with Mother.

41.     Mother and Ex-Wife were divorced by Decree dated December 12, 2016.

42.     In January 2017, Father took a second store-bought paternity test that indicated he is Child's father.     Father received the results of this test in mid-February 2017.

43.     On March 1, 2017, Father took a third paternity test administered by a reputable lab that confirmed he is Child's father.

44.     Father contacted an attorney the day after receiving the lab test results; and he filed a Complaint for Physical Custody and Shared Legal Custody against Mother and Ex-Wife on March 13, 2017.

45.     Father had no contact with Child between her birth and March 2017.

46.     Since March 2017, Mother has facilitated partial physical custody between Father and Child a few days every week.

47.     Child calls Father "Dad."

48.     Child calls Ex-Wife "Mommy."     Child also calls maternal grandmother, maternal great-grandmother, Father's fiancée, and paternal grandmother "Mom" or "Mommy" on occasion.

49.     Ex-Wife holds herself out as Child's mother, although Ex-Wife's family and friends understand she is not a biological parent.

. . .

T.C.O. at 2-9 (citations to record omitted) (footnotes omitted).

On appeal, Ex-Wife raises the following issues for our review:

I. Did the [t]rial [c]ourt err in failing to grant [Ex-Wife] in loco parentis standing under 23 Pa.C.S.[A.] § 5324(2) to pursue continued custody of [C]hild born during same-sex marriage when [Ex-Wife] assumed parental status with consent of biological [m]other and discharged parental duties for nearly two years, wherein [Ex-Wife] established strong bond with [C]hild by providing care, nurture and affection, like that of a parent?

II. Should the [t]rial [c]ourt have used [a] best interest analysis to determine whether or not to vacate [the] Consent Order for Custody entered into between same-sex spouses' [sic] during divorce when: 1.) [C]hild's best interests require [Ex-Wife] be granted standing in order to fully litigate if [the] parent-child relationship should be maintained over natural parent's objection; 2.) the need to protect the rights of a natural parent must be tempered by the paramount need to protect the child's best interests as declared by the Pennsylvania Supreme Court in T.B. v. L.R.M. (Pa. 2001); and 3.) vacating the Consent Order constituted a change in custody under 23 Pa.C.S.[A.] § 5338?

III. Absent corroborative expert testimony, was the [t]rial [c]ourt's finding that [] [C]hild would not remember [Ex-Wife] supported by the record below?

Ex-Wife's Brief at 4.[10]

Our scope and standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand.

_____

[10] We observe that Ex-Wife states her issues somewhat differently than in her Rule 1925(b) Statement, but find that she has preserved her first and second issues. In addition, we note that Ex-Wife raised numerous additional issues in her 1925(b) Statement, which she did not address in her Statement of Questions Involved or her brief. As such, Ex-Wife has waived any claims as to these issues. See Krebs, 893 A.2d at 797; see also In re W.H., 25 A.3d 330, 339 n.3 (Pa.Super. 2011), appeal denied, 611 Pa. 643, 24 A.3d 364 (2011) (quoting In re A.C., 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). With regard to Ex-Wife's third issue, that the trial court erred in determining that Child would not remember Ex-Wife, in light of our discussion infra, we find it unnecessary to address this issue.

However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

C.R.F., III v. S.E.F., 45 A.3d 441, 443 (Pa.Super. 2012) (citation omitted).

See also E.R. v. J.N.B., 129 A.3d 521, 527 (Pa.Super. 2015), appeal denied, 635 Pa. 754, 135 A.3d 586 (2016). This Court consistently has held:

the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

Ketterer v. Seifert, 902 A.2d 533, 540 (Pa.Super. 2006) (quoting Jackson v. Beck, 858 A.2d 1250, 1254 (Pa.Super. 2004)).

Initially, we must first consider whether the July 31, 2017, Order was properly appealable.[11]

"'[S]ince we lack jurisdiction over an unappealable order it is incumbent on us to determine, sua sponte when necessary, whether the appeal is taken from an appealable order.'" Gunn v. Automobile Ins. Co. of Hartford, Connecticut, 971 A.2d 505, 508 (Pa.Super. 2009) (quoting Kulp v. Hrivnak, 765 A.2d 796, 798 (Pa.Super. 2000)). It is well-settled that, "[a]n appeal lies only from a final order, unless permitted by rule or statute." Stewart v. Foxworth, 65 A.3d 468, 471 (Pa.Super. 2013). Generally, a final order is one that disposes of all claims and all parties. See Pa.R.A.P. 341(b).

K.W. v. S.L. & M.L. v. G.G., 157 A.3d 498, 501-02 (Pa.Super. 2017).

_____

[11] While Ex-Wife addressed in her brief the appealability of the order in question, this was not addressed by the trial court.

In the case sub judice, the order in question is not a final order. See G.B. v. M.M.B., T.B. & A.B., 670 A.2d 714 (Pa.Super. 1996) (a custody order is final and appealable after the trial court has concluded its hearings on the matter and the resultant order resolves the pending custody claims between the parties). Ex-Wife concedes this fact. Ex-Wife's Brief at 8. Nonetheless, the order is appealable pursuant to the collateral order doctrine. See Pa.R.A.P. 313(a) (providing that an appeal may be taken as of right from a collateral order of a lower court). "A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b). See also K.C. & V.C. v. L.A., 633 Pa. 722, 729-32, 128 A.3d 774, 779-81 (2015); K.W., 157 A.3d at 501-04 ("standing is an issue separable from, and collateral to, the main cause of action in a child custody case;" the right to intervene in custody cases implicates Pennsylvania's "paramount interest in the welfare of children and, as a result, in identifying the parties who may participate in child custody proceedings;" and the right to appeal is irreparably lost when intervention in child custody proceedings is denied).

Having determined that the subject order was appropriately appealable as a collateral order, we take Ex-Wife's issues out of turn for ease of disposition and address her second issue first. With this issue, Ex-Wife challenges the trial court's vacation of the Consent Order.

The Pennsylvania Rules of Civil of Procedure establish parameters with regard to the filing of a claim for custody and notification of those with parental and custodial rights. Rule 1915.3 provides as follows with regard to the commencement of an action for custody:

Rule 1915.3. Commencement of Action. Complaint. Order

(a) Except as provided by subdivision (c), an action shall be commenced by filing a verified complaint substantially in the form provided by Rule 1915.15(a).

(b) An order shall be attached to the complaint directing the defendant to appear at a time and place specified. The order shall be substantially in the form provided by Rule 1915.15(b).

Note: See § 5430(d) of the Uniform Child Custody Jurisdiction and Enforcement Act, 23 Pa.C.S.[A.] § 5430(d), relating to costs and expenses for appearance of parties and child, and 23 Pa.C.S.[A.] § 5471, relating to intrastate application of the Uniform Child Custody Jurisdiction and Enforcement Act.

(c) A claim for custody which is joined with an action of divorce shall be asserted in the complaint or a subsequent petition, which shall be substantially in the form provided by Rule 1915.15(a).

Note: Rule 1920.13(b) provides that claims which may be joined with an action of divorce shall be raised by the complaint or a subsequent petition.

(d) If the mother of the child is not married and the child has no legal or presumptive father, then a putative father initiating an action for custody must file a claim of paternity pursuant to 23 Pa.C.S.[A.] § 5103 and attach a copy to the complaint in the custody action.

Note: If a putative father is uncertain of paternity, the correct procedure is to commence a civil action for paternity pursuant to the procedures set forth at Rule 1930.6.

. . .

Pa.R.C.P. No. 1915.3 (bold in original).

Further, Rule 1915.15, in relevant part, sets forth the following as to notification of those with custodial and/or parental rights:

Rule 1915.15. Form of Complaint. Caption. Order. Petition to Modify a Custody Order

. . .

6. Plaintiff (has) (has not) participated as a party or witness, or in another capacity, in other litigation concerning the custody of the child in this or another court. The court, term and number, and its relationship to this action is:

_____
_____
_____

Plaintiff (has) (has no) information of a custody proceeding concerning the child pending in a court of this Commonwealth or any other state. The court, term and number, and its relationship to this action is: _____

Plaintiff (knows) (does not know) of a person not a party to the proceedings who has physical custody of the child or claims to have custodial rights with respect to the child. The name and address of such person is:

_____

. . .

8. Each parent whose parental rights to the child have not been terminated and the person who has physical custody of the child have been named as parties to this action. All other persons, named below, who are known to have or claim a right to custody of the child will be given notice of the pendency of this action and the right to intervene:

Name                     Address                     Basis of Claim

_____

_____

_____

9.(a) If the plaintiff is a grandparent who is not in loco parentis to the child and is seeking physical and/or legal custody pursuant to 23 Pa.C.S.[A.] § 5323, you must plead facts establishing standing pursuant to 23 Pa.C.S.[A.] § 5324(3).

_____

_____

(b) If the plaintiff is a grandparent or great-grandparent who is seeking partial physical custody or supervised physical custody pursuant to 23 Pa.C.S.[A.] § 5325, you must plead facts establishing standing pursuant to § 5325.

_____

_____

(c) If the plaintiff is a person seeking physical and/or legal custody pursuant to 23 Pa.C.S.[A.] § 5324(2) as a person who stands in loco parentis to the child, you must plead facts establishing standing.

_____

_____

. . .

Pa.R.C.P. No. 1915.15 (bold in original).

In addition, when seeking custody in connection with an action for divorce, Rule 1920 provides:

Rule 1920.13. Pleading More Than One Cause of Action. Alternative Pleading

(a)    The plaintiff may state in the complaint one or more grounds for divorce and may join in the alternative a cause of action for annulment.

(b)    The plaintiff may

> (1) join in the complaint in separate counts any other claims which may under the Divorce Code be joined with an action of divorce or for annulment or, if they have not been so joined, the plaintiff may as of course amend the complaint to include such other claims or may file to the same term and number a separate supplemental complaint or complaints limited to such other claims; or
>
> (2) file to the same term and number a subsequent petition raising such other claims.
>
> (c) The court may order alimony pendente lite, reasonable counsel fees, costs and expenses pending final disposition of any claim.

Pa.R.C.P. No. 1920.13 (bold in original).

Moreover, Rule 1915.7 states as follows with regard to Consent Orders:

> Rule 1915.7. Consent Order
>
> If an agreement for custody is reached and the parties desire a consent order to be entered, they shall note their agreement upon the record or shall submit to the court a proposed order bearing the written consent of the parties or their counsel.

Pa.R.C.P. No. 1915.7 (bold in original).

In the instant matter, in vacating the Consent Order entered into by

Mother and Ex-Wife, the trial court reasoned as follows:

> In the case at bar, Mother and Ex-Wife short-circuited the custody process. Neither woman filed either a custody complaint or a count for custody in the divorce action. Nevertheless, they jointly presented a Consent Order for Custody in the divorce case, which the trial court executed. It is clear that Father was not given notice of the pendency of this action or the right to intervene in accordance with the Rules of Civil Procedure. Mother and Ex-Wife's collective failure to properly file the Consent Order in a custody action/count does not relieve them of the obligations to notify all parties who could claim a right to Child's custody.
>
> The trial court acknowledges that Mother and Ex-Wife did not have confirmation of Child's paternity when they reached the custody

- 14 -

agreement on August 15, 2016. D.F. had been excluded as Child's father on February 3, 2016; Father had been ruled out in March 2016. Despite the apparently-inexplicable test results, Mother and Ex-Wife knew Child had a father; they did not know the father's identity. Mother and Ex-Wife failed or refused to take reasonable steps at that time to determine Child's parentage by retesting the putative fathers. (Father's second paternity test did not occur until January 2017, after the Consent Order was filed.) Because of their omission, Mother and Ex-Wife entered into the Consent Order for Custody at their own risk; and the Consent Order cannot stand. Accordingly, Father's Motion to Vacate Order and Mother's Petition to Vacate Consent Order for Custody are **GRANTED**.

T.C.O. at 10-11 (footnotes omitted) (emphasis in original).

Ex-Wife argues that the trial court should have utilized a best interest analysis in determining whether to vacate the Consent Order. Ex-Wife's Brief at 16-17. Ex-Wife asserts that Child's best interests supersede any parental objection to third party standing and Child's best interests support her standing to pursue custody. Id. Moreover, Ex-Wife posits that the resulting change to the Consent Order as to Ex-Wife amounts to a modification requiring a formal best interest analysis pursuant to 23 Pa.C.S.A. § 5328. Id. at 16. In so arguing, Ex-Wife states:

The [t]rial court's Order[] of July 7, 2017[][12] vacated the existing Consent Order for Custody, dated August 15, 2016, between Mother and [Ex-Wife]. The change to the Order, reducing and eliminating [Ex-Wife] from the child's life, clearly constitutes a "modification of an existing Order" which triggers a best interest analysis under 23 Pa.C.S.[A.] § 5328.

Our [c]ourts have held that a natural parent's objection to a third party's in loco parentis relationship is not grounds to deny standing because the best interests of the child is paramount to

_____

[12] As indicated, this order was not entered until July 31, 2017.

the rights of a parent. Standing is fact sensitive, based upon the conduct/actions of the third party towards the child. Once standing is granted, the third party must meet their evidentiary burden which provides protection to biological parents against unwanted intrusion into the sanctity of the family. Here[,] however, there is no intact family unit to protect. Mother is remarried to another woman. Father has a fiancée to whom [sic] has a son. And, [Ex-Wife] lives with her boyfriend.

The [t]rial [c]ourt never considered the child's best interests which, as previously stated, are paramount to the rights of a natural parent to object to a third party's standing. Under Pennsylvania law, a best interest analysis would have proven that removal of a stepparent from a child's life wreaks the same havoc and negative effects as removal of a parent.

Thus, the [t]rial [c]ourt committed an error of law in failing to grant standing to [Ex-Wife] and in failing to apply the best interest factors to determine if modification, i.e. reduction/elimination of [Ex-Wife]'s partial physical custody, was in child's best interests.

Id. at 16-17 (citation omitted).

Upon review, we disagree. We discern no abuse of discretion by the trial court in vacating the Consent Order. Mother and Ex-Wife did in fact "short-circuit" the custody process. Mother and Ex-Wife failed to file a Complaint for Custody or a count for custody in the Complaint for Divorce, as required, in complete disregard of the Rules of Civil Procedure.[13] Moreover, as noted by the trial court, "Father's fundamental constitutional right to parent Child" favors vacation of the Consent Order. T.C.O. at 11. As a result, as determined by the trial court, this procedural deficit requires that the Consent

_____

[13] We do, however, disagree with the trial court's suggestion that both Mother and Ex-Wife "failed or refused to take reasonable steps at that time to determine Child's parentage by retesting the putative fathers." T.C.O. at 11. We decline to state that Mother and Ex-Wife had a duty to "retest" either Father or D.F. and find that the trial court erred in creating such a duty.

Order be vacated. Ex-Wife's second issue is, therefore, without merit and fails.

Next, with Ex-Wife's first issue, she alleges error generally with regard to the trial court's finding that she did not stand in loco parentis to pursue custody of Child. Ex-Wife's Brief at 9-16. Ex-Wife maintains that she "fully assumed her parental status with the consent of Mother and discharged parental duties, for nearly two years, wherein [Ex-Wife] established a strong bond with the child by providing care, nurture and affection, like that of a parent." Id. at 10.

A trial court's determination regarding standing will not be disturbed absent an abuse of discretion. Butler v. Illes, 747 A.2d 943, 944 (Pa.Super. 2000). As we have stated, "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." Bulgarelli v. Bulgarelli, 934 A.2d 107, 111 (Pa.Super. 2007) (quotation omitted).

As to third parties and standing with respect to custody, 23 Pa.C.S.A. § 5324 provides as follows:

§ 5324. Standing for any form of physical custody or legal custody.

The following individuals may file an action under this chapter for any form of physical custody or legal custody:

(1) A parent of the child.

(2)  A person who stands in loco parentis to the child.

(3)  A grandparent of the child who is not in loco parentis to the child:

>   (i)  whose relationship with the child began either with the consent of a parent of the child or under a court order;

>   (ii)  who assumes or is willing to assume responsibility for the child; and

. . .

23 Pa.C.S.A. § 5324.

For purposes of the instant matter, we focus on "in loco parentis."[14]  On this topic, this Court has stated:

> Generally, the Child Custody Act does not permit third parties to seek custody of a child contrary to the wishes of that child's parents.  The Act provides several exceptions to this rule, which apply primarily to grandparents and great-grandparents.  See 23 Pa.C.S.A. § 5324(3);  23 Pa.C.S.A. § 5325.  In fact, unless a person seeking custody is a parent, grandparent, or great-grandparent of the child, the Act allows for standing only if that person is "in loco parentis."  23 Pa.C.S.A. § 5324(2).

> "The term in loco parentis literally means 'in the place of a parent.'"  Peters v. Costello, 586 Pa. 102, 891 A.2d 705, 710 (2005) (citing Black's Law Dictionary, 791 (7th Ed. 1991)). A person stands in loco parentis with respect to a child when he or she "assum[es] the obligations incident to the parental relationship without going through the formality of a legal adoption.  The status of in loco parentis embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties."  Id. (quoting T.B. v. L.R.M., 567 Pa. 222, 786 A.2d 913, 916-17 (2001)).  Critical to our discussion here, "in loco parentis status cannot be achieved without the consent and knowledge of, and in disregard of [,] the wishes of a parent."  E.W.

---

[14] Mother asserts that Ex-Wife argues standing as a parent.  While Ex-Wife offered a presumption of parentage and parentage by estoppel in her reply to Mother's petition to vacate the consent order and her Rule 1925(a)(2)(i) statement, Ex-Wife has not pursued those arguments in this Court.

v. T.S., 916 A.2d 1197, 1205 (Pa.[Super.] 2007) (citing T.B., supra).

K.W., 157 A.3d at 504-05. "[T]he showing necessary to establish in loco parentis status must in fact be flexible and dependent upon the particular facts of the case." J.A.L. v. E.P.H., 682 A.2d 1314, 1320 (Pa.Super. 1996).

Of relevance, looking to cases involving step-parents, we have held that former same-sex partners are entitled to in loco parentis standing as third parties where they "lived with the child and the natural parent in a family setting, whether a traditional family or a nontraditional one, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent." J.A.L., 682 A.2d at 1321; see also T.B. v. L.R.M., 567 Pa. 222, 232-33, 786 A.2d 913, 918-19 (2001). Specifically, as we summarized recently in C.G. v. J.H., 172 A.3d 43 (Pa.Super. 2017), allocatur granted, No. 769 MAL 2017 (January 17, 2018):

> In T.B., the trial court found that a same-sex partner, T.B., had in loco parentis standing to the child at issue, A.M. This Court and the Supreme Court of Pennsylvania affirmed. In its opinion, the Supreme Court deferred to the trial court's factual findings because the record supported them. T.B., 786 A.2d at 919. Those findings included that the parties "engaged in an exclusive, intimate relationship," "shared finances and expenses," "jointly purchased a home," "decided to have a child," and "agreed that [the biological mother, L.R.M.] would be impregnated by a sperm donor and that [T.B.] would choose the donor." Id. at 914-15 (footnote omitted). T.B. "cared for [L.R.M.] during her pregnancy and attended childbirth classes with her[, and] was the designated co-parent for purposes of being present in the operating room during the birth." Id. at 915. After the child was born, the parties lived together with the child but did not enter into a formal parenting agreement. Id. L.R.M. named T.B. as guardian of the child in her will. Id. L.R.M. and T.B. "shared day-to-day child rearing responsibilities, including taking [the child] for medical

check-ups and other appointments." Id. T.B. "was active, yet deferential to [L.R.M.] in making parental decisions." Id. Accepting the trial court's findings, the Court agreed that T.B. stood in loco parentis and had standing to seek partial custody. Id. at 919-20.

In J.A.L., this Court reversed a trial court ruling that a same-sex partner, J.A.L., lacked in loco parentis standing with respect to the child there at issue, G.H. J.A.L., 682 A.2d at 1316. We stated that "[t]he facts as found by the trial court clearly indicate that [the biological mother,] E.P.H. and J.A.L. lived together ... as a nontraditional family, for many years before the birth of the child" and that the child "was to be a member of their nontraditional family." Id. at 1321. Those facts included: "the parties agreed that E.P.H. would be artificially inseminated to attempt to conceive a child whom the parties would raise together"[;] the parties selected a sperm donor together; J.A.L. performed the inseminations; J.A.L. accompanied E.P.H. to doctor visits and childbirth classes; J.A.L., along with two other friends of E.P.H., was present at the birth of the child; and the child was given J.A.L.'s surname as a middle name. Id. at 1316. In addition, before the child's birth, the parties consulted an attorney who drafted documents, including "a Nomination of Guardian in which E.P.H. named J.A.L. as the guardian of the child in the event of E.P.H.'s death or disability"; "an Authorization for Consent to Medical Treatment of Minor, permitting J.A.L. to consent to medical or dental treatment of the child[;]" "a Last Will and Testament for each party, providing for the other party and the child[,]" and, in E.P.H.'s will, a clause appointing J.A.L. as the guardian of the child; and a co-parenting agreement. Id. at 1316-17. The parties executed all of these documents except for the co-parenting agreement, which J.A.L. refused to execute after counsel advised the parties that the agreement was not enforceable in Pennsylvania. Id. at 1317. After the child's birth, the parties lived together with the child, and J.A.L. "assisted with all aspects of the care of the baby." Id. After the parties separated, J.A.L. visited the child frequently and regularly. Id. at 1317, 1322.

C.G., 172 A.3d at 57-58.

Notably, however, in C.G., we affirmed the trial court's determination that a former same-sex partner did not stand in loco parentis due to the

specific factual circumstances of the case. In distinguishing C.G. from J.A.L. and T.B., we stated:

> The court's holding rests on the unique facts of this case, and there are significant distinctions between this case and T.B. and J.A.L., the main decisions on which C.G. relies. For example, in T.B. and J.A.L., the parties decided together to have a child; here, the court credited J.H.'s testimony that C.G. "never agreed to have a child, but merely tolerated the idea of [J.H] having a child." Moreover, unlike the parties seeking custody in T.B. and J.A.L., C.G. did not participate in educational or medical decisions regarding the child, was not intended to be the child's guardian if something happened to J.H., and acted more like a babysitter than a parent. Further, there were no formal documents indicating a co-parenting arrangement, the child did not bear C.G.'s surname, and C.G. did not visit the child frequently and regularly after the parties separated.

Id. at 58-59 (citations omitted).

Moreover, in loco parentis status cannot be in defiance of the natural parents' wishes and the parent-child relationship. T.B., 567 Pa. at 229, 786 A.2d at 917. Notwithstanding, such defiance must have been to the creation of a parent-child bond with the third party, rather than to the continuation of the relationship. Liebner v. Simcox, 834 A.2d 606, 610 (Pa.Super. 2003). This has been reiterated in cases involving prospective adoptive parents where a child has been placed for adoption against a natural parent's wishes. See B.A. v. E.E. ex rel. C.E., 559 Pa. 545, 741 A.2d 1227 (1999) (reversing and vacating the trial court's order granting prospective adoptive parents standing in loco parentis where the father refused to consent to the child's adoption and attempted to gain custody from shortly after the child's birth); K.W., 157

A.3d at 505-07 (reversing the trial court's order granting prospective adoptive parents standing in loco parentis where the mother placed child for adoption without the father's knowledge of her pregnancy and, upon location by the adoption agency, the father expressed his lack of consent and filed for custody shortly thereafter). Nevertheless, a natural parent cannot seek to "eras[e] a relationship between a former partner and a child which was voluntarily created and actively fostered simply because after the parties' separation [the natural parent] regretted having done so." J.A.L., 682 A.2d at 1322; see also T.B., 567 Pa. at 232, 786 A.2d at 919. Also a factor and consideration, is whether only limited custody rights were being sought by the third party. J.A.L., 682 A.2d at 1321.

In the case sub judice, while acknowledging a parent-child relationship, in determining Ex-Wife lacked in loco parentis standing, the trial court reasoned as follows:

> In the case at bar, Ex-Wife is in a similar position to the prospective adoptive parents in B.A. and K.W., supra. Here, Mother attempted to confer in loco parentis status on Ex-Wife, initially when they agreed to raise Child in an intact marriage, and later when they entered into a Consent Order for Custody. Father reasonably believed he was not Child's father at that time. First, Mother told Father that the date of conception "didn't match up to" the dates of their sexual encounters. Second, an initial paternity test (purchased from a drug store) concluded he was not Child's father. However, from mid-February 2017, when Father received positive results from a second store-bought paternity test, he took swift and decisive action. On March 1, 2017, Father took a third paternity test administered by a reputable lab. One day after receiving confirmation from the lab that he is Child's father, he contacted an attorney. On March 13, 2017, Father filed a custody complaint against Mother and Ex-Wife. When Father

learned of his paternity, his actions were immediately inconsistent with consent to Ex-Wife's in loco parentis status.

Several other salient facts likewise support the trial court's decision. Father and Mother were engaged in a relationship. Father was not one of the men recruited by Mother and Ex-Wife to be a sperm donor. Mother and Father did not conceive Child to be raised by Mother and Ex-Wife. Ex-Wife is not a biological parent. Ex-Wife did not pursue adoption through the courts. Ex-Wife's marriage to Mother lasted only six weeks after Child's birth. The Child was less than two years old when the trial court ordered Ex-Wife to transition from Child's life. Child likely will not remember this period in her youth. The trial court cannot continue to perpetrate the fiction of Ex-Wife's in loco parentis status based on her short relationship with Child, which Mother and Ex-Wife facilitated in defiance of Father's constitutional rights.

T.C.O. at 15-16.

Upon review, we disagree with the trial court and find that Ex-Wife does have standing in loco parentis with respect to Child. The record reveals that Ex-Wife participated in the pregnancy and preparations prior to Child's birth, as well as Child's birth. N.T. at 9, 34, 38-39, 86, 103. Further, Mother and Ex-Wife were married at the time of Child's birth and, regardless of the ultimate length of the marriage, they had the intent to jointly raise Child "together in a happy marriage." Id. at 7, 22, 34, 47. Ex-Wife was named as a parent on Child's birth certificate and involved in the naming of Child. Id. at 34, 86, 104. Prior to Child's birth, Mother and Ex-Wife consulted an attorney regarding termination of D.F.'s parental rights. Id. at 39, 46-48, 103. Moreover, while there was some disparity as to the extent of Ex-Wife's involvement, Ex-Wife was clearly involved financially and otherwise during the marriage and remained involved in Child's life after separation. Id. at 13-14,

18-19, 34, 86-89, 91, 94-95, 101-02. Although known to family and friends that she was not Child's biological parent, Ex-Wife likewise held herself out as Child's parent. Id. at 94-95, 123-24. Significantly, while declining to confer standing, the trial court even found the existence of a parent-child relationship as to Ex-Wife and Child, stating as follows:

> Here, there is little doubt that Ex-Wife established a parent-like relationship with Child during the approximately six weeks Mother and Ex-Wife were happily married after Child's birth. Even after Mother and Ex-Wife separated (December 16, 2015), but prior to Ex-Wife's departure from the residence (April 2016), Ex-Wife performed day-to-day childcare duties consistent with her schedule of work, school, and relationships. After separation, Mother afforded Ex-Wife increasing amounts of custody, culminating in the Consent Order of August 15, 2016.

T.C.O. at 13.

By way of contrast from the cases involving prospective adoptive parents, instantly, a situation is presented where Mother is attempting in hindsight to expunge Ex-Wife's relationship with Child, a relationship that was created, fostered, and continued, regardless of any legal beliefs or advice, by Mother, a biological parent, since prior to Child's birth and for approximately a year and a half thereafter. Also distinguishable, Mother was the only known biological parent, as Child's paternity was unknown, until Child was approximately 1½ years old. See Father's Exhibit 1. In addition, Father, once aware of his paternity, filed a Complaint for Custody against both Mother and Ex-Wife. N.T. at 62-63. Notably, he did not file to challenge Ex-Wife's standing. Further, unlike prospective adoptive parents, whose intent by virtue

of adoption is to completely supplant and oust the biological parents, Ex-Wife does not intend to completely supplant and oust Mother and Father. See Ex-Wife's Brief at 13.

Importantly, we recognize that this conferral of standing does not automatically result in or equate to custodial time for Ex-Wife. It merely allows the trial court to consider Child's best interests. J.A.L., 682 A.2d at 1319-20.

> . . .The existence of such a colorable claim to custody grants standing only. In other words, it allows the party to maintain an action to seek vindication of his or her claimed rights. A finding of prima facie right sufficient to establish standing does not affect that party's evidentiary burden: in order to be granted full or partial custody, he or she must still establish that such would be in the best interest of the child under the standards applicable to third parties.

Id. As we further stated, "A determination of standing simply implies that the party has a substantial interest in the subject matter of the litigation and that the interest is direct, immediate and not a remote consequence." T.B., 567 Pa. at 233, 786 A.2d at 919-20 (citation omitted). However, it "does not speak to [the] chance of success on the merits, but merely affords . . . the opportunity to fully litigate the issue." Id. at 233-34, 920.

Accordingly, for the foregoing reasons, we affirm the order of the trial court in part, and vacate and remand in part.

We affirm the trial court's order as it relates to the Consent Order. However, we vacate the trial court's order as it relates to Ex-Wife's standing and remand for a custody hearing on the merits as to Father's Complaint for

Custody as against Mother and Ex-Wife. The custody hearing should be accomplished as quickly as is practicable in order to satisfy the interests of finality and stability in custody arrangements for the Child.

Additionally, it is hereby Ordered that the custody arrangement with Ex-Wife having physical custody every weekend (Friday at 5:00 p.m. to Monday at 12:00 p.m.) shall be reinstated pending the outcome of the new hearing.

Order affirmed in part, and vacated and remanded in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/7/2018