J-A25040-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| C.L.A. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| P.K. AND G.M. | : | |
| | : | |
| | : | |
| APPEAL OF: P.K. | : | No. 632 MDA 2019 |

Appeal from the Order Entered April 2, 2019
in the Court of Common Pleas of Columbia County
Domestic Relations at No(s): 2018-CV-0000348-CU

BEFORE: STABILE, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED MARCH 16, 2020**

P.K. ("Mother") appeals from the Order determining that C.L.A. ("Partner"), who is Mother's former same-sex partner, has *in loco parentis* standing as to O.E.K. (the "Child," a male born in March 2013).[1]  We affirm.

In its Opinion and Order, the trial court skillfully set forth the factual background and procedural history of this appeal up to the entry of its September 17, 2018 Opinion and Order, which we adopt and incorporate herein.  *See* Trial Court Opinion, 9/17/18, at 1-9.

Following the trial court's entry of the September 17, 2018 Order determining that Partner had *in loco parentis* status, the court-appointed special master held a custody conference with the parties.  On December 6,

_____

[1] Child's father, G.M. ("Father"), has not filed an appeal, nor has he filed a brief in the instant appeal.

2018, the special master filed his report and recommendations in the trial court. By Order, the trial court adopted the report and recommendations on an interim basis, awarding shared legal custody to Partner and Mother, primary physical custody to Mother, and partial physical custody to Partner in accordance with Partner's and Mother's schedules. Mother proceeded to file Exceptions to the recommendations, and specifically challenged the finding that Partner had *in loco parentis* standing.

Following a pre-trial conference, the trial court entered its final Order on April 2, 2019, regarding Partner's *in loco parentis* standing and the parties' custody award. In the Order, the trial court adopted the parties' stipulation to the substance of the interim Order, with the sole exception being Mother's ongoing objection to the granting of *in loco parentis* status to Partner. The parties also waived a full custody trial on Mother's Exceptions to the Order, and waived the necessary findings that would follow a non-jury trial. On April 23, 2019, Mother timely filed the instant Notice of Appeal, along with a court-ordered Pa.R.A.P. 1925(b) Concise Statement of Errors Complained of on Appeal.[2]

_____

[2] We observe that an appeal will lie only from a final order. **Stewart v. Foxworth**, 65 A.3d 468, 471 (Pa. Super. 2013). Here, the trial court specifically indicated in the stipulated April 2, 2019 Order that the custody Order was to be regarded as the trial court's final Order. **See** Trial Court Order, 3/26/19, at 1. Thus, we address only the issue of Partner's *in loco parentis* status in this appeal. **See G.B. v. M.M.B.**, 670 A.2d 714, 720 (Pa. Super. 1996) (stating that "a custody order will be considered final and appealable only if it is both: 1) entered after the court has completed its hearings on the merits; and 2) intended by the court to constitute a complete resolution of the custody claims pending between the parties.").

Mother raises the following issue on appeal:

Did the trial court abuse its discretion and misapply the law when it determined that [Partner] stands [*in loco parentis*] to [Child], when [Partner] did not have any part in the conception, pursued another partner and attempted to adopt another child up until one month before [Child's] birth[; Partner] used her education and background as a social worker to take advantage of [Mother; Partner] was never listed as guardian or emergency contact on any of [Child's] executed paperwork[; Partner] [] never cared for [Child] by herself[;] and [Partner] never made any medical, educational, or religious decisions for [Child]?

Mother's Brief at 4.

Mother asserts that the trial court abused its discretion and/or committed an error of law in determining that Partner had *in loco parentis* standing to pursue custody of Child. *Id.* at 24-25. Mother argues that the facts of the present case are distinguishable from the facts in the three primary cases upon which the trial court relied in rendering its decision: *A.J.B. v. A.G.B.*, 180 A.3d 1263 (Pa. Super. 2018); *T.B. v. L.R.M.*, 786 A.2d 913 (Pa. Super. 2001); and *J.A.L. v. E.P.H.*, 682 A.2d 1314 (Pa. Super. 1996). Mother's Brief at 27. Rather, Mother asserts that the facts of the instant case are more akin to those in *C.G. v. J.H.*, 172 A.3d 43 (Pa. Super. 2017). Mother's Brief at 42. Mother provides, as her reasons for requesting that this Court vacate the trial court's Order, the following: Partner did not have any part in the conception of Child; Partner pursued another partner and attempted to adopt another child up until one month prior to Child's birth; Partner used her education and background as a social worker to take

advantage of Mother; Partner was never listed as guardian or emergency contact on any of Child's executed paperwork; Partner never cared for Child by herself; and Partner never made any medical, educational, or religious decisions for Child. *Id.* at 24.

Our standard of review over questions of *in loco parentis* standing is well settled:

> Threshold issues of standing are questions of law; thus, our standard of review is *de novo* and our scope of review is plenary.
>
> Generally, the Child Custody Act[, 23 Pa.C.S.A. §§ 5321-5340,] does not permit third parties to seek custody of a child contrary to the wishes of that child's parents. The Act provides several exceptions to this rule, which apply primarily to grandparents and great-grandparents. *See* [*id.*] § 5324(3); [] 5325. In fact, unless a person seeking custody is a parent, grandparent, or great-grandparent of the child, the Act allows for standing only if that person is "*in loco parentis*." [*Id.*] § 5324(2).
>
> The term *in loco parentis* literally means "in the place of a parent." A person stands *in loco parentis* with respect to a child when he or she assumes the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties. Critical to our discussion here, *in loco parentis* status cannot be achieved without the consent and knowledge of, and in disregard of, the wishes of a parent.

*K.W. v. S.L.*, 157 A.3d 498, 504-05 (Pa. Super. 2017) (some emphasis added; some citations and quotation marks omitted; brackets omitted).

This Court has explained that:

> [t]he presumption [favoring a custody award to the parent over a third party] is rebuttable by clear and convincing evidence, which we have defined as presenting evidence that is so clear, direct, weighty, and convincing so as to enable the trier of fact to

come to a clear conviction, without hesitation, of the truth of the precise facts in issue.

* * *

As suggested by our Supreme Court's discussion in **T.B.**, **supra**, *in loco parentis* status merely provides a third party an opportunity to establish that maintaining that relationship supersedes the birth parent's opposition. The High Court observed, [w]here [a] relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections. Significantly, neither the Supreme Court's discussion in **T.B.** nor the text of § 5327(b) indicates that *in loco parentis* status effectively places a third-party on equal footing with a birth parent. To the contrary, § 5327 provides that the presumption applies [i]n any action regarding the custody of a child between a parent of the child and a non-parent[.] If our legislature desired to carve an exception to the presumption when the nonparent attained *in loco parentis* status, it could have done so; however, it did not.

**M.J.S. v. B.B.**, 172 A.3d 651, 660 (Pa. Super. 2017) (emphasis, citations and quotation marks omitted).

The trial court adequately summarized the cases Mother relies on, ably considered her claim, and determined that Partner is entitled to *in loco parentis* standing. **See** Trial Court Opinion, 9/17/18, at 9-15. It compared the instant facts to the facts in **A.J.B.**, **T.B.**, and **C.G.**, and determined that Partner performed parental duties, and participated in medical, religious, speech therapy, and other educational decisions for Child. **Id.** at 15. In particular, the trial court credited the time that Partner, Mother, and Child lived together; their intent to jointly raise Child as a family; Partner's presence for Child's birth; Mother's decision to give Child Partner's last name on his

birth certificate; Partner's payment of expenses for both Mother and Child; Partner's performance of parental duties; Mother's express written intent for Partner to take Child as her own; and Mother's recordings of Child expressing his parental affection for Partner as evidence supporting its determination of *in loco parentis* status for Partner. *Id.* at 11-13.

Our review confirms that the trial court's determination is supported by competent evidence in the record, and we will not disturb the credibility and weight determinations of the trial court. *See C.R.F.*, 45 A.3d at 443. We find no abuse of the trial court's discretion, nor do we find any error of law on the part of the trial court in rejecting Mother's contention that the facts of this case are more closely aligned with those in *C.G.*, such that *C.G.* should control the outcome of this case. Accordingly, we affirm on the basis of the trial court's Opinion. *See* Trial Court Opinion, 9/17/18, at 1-16.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/16/2020

- 6 -

C      L. A
          Plaintiff,

vs.

P      K        and G
M
          Defendants.

: IN THE COURT OF COMMON PLEAS
: OF THE 26TH JUDICIAL DISTRICT
: COLUMBIA COUNTY BRANCH
:
:
: CIVIL ACTION - CUSTODY
:
:
: NO.:   348-CV-2018
:

TIMOTHY A. BOWERS, ESQ., for Plaintiff
DAVID C. JAMES, ESQ., for Defendant √
Defendant G        M        : No appearance

September 17, 2018       Norton, J.

# OPINION AND ORDER

## OPINION

The present case involves an assertion of in loco parentis status by Plaintiff,

Defendant/Mother's ("Mother") former paramour, with respect the subject minor child,

OEK, date of birth, March  , 2013. Plaintiff filed this action against Mother on March

20, 2018. Mother filed Preliminary Objections contesting Plaintiff's standing on April 9,

2018. The biological father, G       M       , was joined and served, but did not

appear. Hearings were held on September 4, 2018 and September 12, 2018.

Plaintiff and Mother were in an intimate, same-sex relationship and Plaintiff

claims in loco parentis status and standing to participate in these custody proceedings.

See: 23 Pa.C.S. §5324(2). The facts presented by the respective parties had

similarities in certain respects and were contradictory in many others. It is the

conclusion of this fact finder that both parties embellished their viewpoints, exaggerated

facts which they thought were to their benefit and minimized facts which they thought

were to their detriment. The factual summary herein is the product of factual

determinations by this Court, according credibility to each party on certain facts, neither party on others and finding the truth to be somewhere in between each respective parties' version in many instances.

Mother and Plaintiff met in a domestic violence shelter where both were clients in Pottsville PA in September, 2012, when Mother was 2 ½ months pregnant. A romantic and intimate relationship began between Mother and Plaintiff. Although intermittently professing love for each other and engagement to marry, even through 2017, the relationship was acrimonious, with frequent separations, reciprocal perpetration of domestic violence and very dysfunctional interactions. Mother moved in with Plaintiff's sister in Sunbury, PA for 3-4 weeks in October of 2012, then to Mother's sister's home in Tamaqua, PA in November, 2012 where Mother stayed for less than one month. In approximately December of 2012, Mother moved to the Hotel Edison in Sunbury, PA. Although Mother claimed that her move to Sunbury was only for the inexpensive rent, Mother had no connection to Sunbury except through Plaintiff, where Plaintiff resides. Therefore, Mother's denials of moving to Sunbury to be near Plaintiff are not credible. It is found that Mother's motivation in moving to Sunbury was to continue her relationship with Plaintiff.

The parties lived together in Sunbury, at least beginning in February of 2013, but there were numerous arguments, incidents of domestic abuse and separations. During one break in their relationship, in late 2012 to February of 2013, Plaintiff attempted a reconciliation with a former paramour. Nonetheless, the parties did, in their better moments, speak at length regarding the impending birth of OEK, that they would be a "family," and that Mother and Plaintiff would raise OEK together, as co-parents.

2

Promises were made to each other, and eventually, Mother even admitted promising

OEK that she would not take Plaintiff away from OEK:

> You don't have to see me. You can pick [OEK] up. Please
> put [OEK's} needs First. He [loves - heart symbol] u!!! I
> promised [OEK]. ... He lights up when he see's you. . ... I
> know you don't believe I won't take [OEK] away from you so
> believe I would <u>Never</u> take <u>you</u> away from [OEK]. I
> promised <u>Him</u>. Its you that He knows is not showing up.
> Please make plans, **we're still Family**. You don't have to
> abandon **your Son** cuz it didn't work out with his Mom....[sic]
> (Emphasis added).

Ex. P-7, Letter from Mother to Plaintiff in September or October of 2015. Mother claims

to have been manipulated by Plaintiff into periodic agreements that Plaintiff had co-

parent status with OEK and that Mother really did not intend to extend such status to

Plaintiff. Plaintiff has a Master's degree in social work, and is professionally employed.

Although Mother is disabled and does not have the intellectual functioning level of

Plaintiff, Mother was not coerced or manipulated in any way which excuses Mother from

the commitments she made.

The parties lived together in an apartment in Sunbury from February, 2013 to

February, 2014, when Plaintiff moved out due to the problems in the relationship.

Plaintiff moved in with Plaintiff's sister, only about one-half of a mile away. The

apartment was rented in February, 2013 by both parties, one month prior to OEK's

birth, so that the Plaintiff, Mother and OEK could have a place to live together "as a

family." Rent and utilities were shared by both parties during this time.

OEK was born on March , 2013, and within 17 days, on March , 2013,

Plaintiff filed a Protection From Abuse Petition against Mother, resulting in a temporary

3

order vesting custody with Plaintiff. Shortly after, on April 3, 2013, the parties reconciled and Plaintiff withdrew the PFA Petition. In her withdrawal, Plaintiff said she was "most likely going to lose," and that she and OEK were "safe." Very little weight is attributed to Plaintiff's statement that she was "most likely going to lose," as this was a flippant, off the cuff statement made with no representation at a time when all Plaintiff wanted to do was reconcile with Mother.

OEK's original birth certificate was entered into the record as Ex. P-1. It clearly evidences that OEK's original surname was "A         " Plaintiff's surname. The parties discussed this at the time of OEK's birth and Plaintiff's surname was assigned to OEK in recognition of Plaintiff's status as a co-parent. This was verbally agreed and the intent to accord Plaintiff co-parent status was corroborated in the multiple writings authored by Mother entered into the record and discussed herein. Mother's claim that she originally assigned Plaintiff's surname to OEK to protect OEK from violence allegedly threatened by R·      G      of New Hampshire, so that Mr. G      could not determine OEK's whereabouts, is deemed to be incredible. Plaintiff was present for OEK's birth, and cut OEK's umbilical cord. Plaintiff attended most prenatal appointments with Mother. By some unknown procedure, which did not involve formal name change proceedings, Mother was able to propound upon the Pennsylvania Department of Health in 2016 to change OEK's last name to Mother's surname.

On Mothers' Day 2013[1], Mother created a Mothers' Day card which purported to be from OEK, then two (2) months old, to both Plaintiff and Mother. Its salutation was

---

[1] The court will take judicial notice of the fact that Mothers' Day in 2013 was on May 12, 2013.

4

addressed to "my mommies." Ex. P-4. Through the time at which OEK learned to speak, both parties referred to Plaintiff when speaking to OEK as "Mama C ." When OEK began to speak, he began to refer to Plaintiff as "Yeah," picking that up from the word "yeah" articulated by Mother when she would talk to Plaintiff.

During their period of residence together, both parties shared parenting duties, but Mother was the primary caretaker, since she is disabled and did not work outside the home, and Plaintiff does work in steady jobs. At various times, both parties fed OEK, bathed him, changed him, attended doctors' appointments and otherwise attended to his needs. Plaintiff participated in important life decisions regarding OEK.

At Thanksgiving, 2013, Mother sent a home made card to Plaintiff, expressing various things for which Mother was thankful:

> ....Thankful for God, for blessing **us** with a son....most of all
> our _Love_ a gift from above. Thankful for our soul contract...."
> (Emphasis added).

Ex. P-5. During the residence of the parties together, and thereafter, Plaintiff and Mother held Plaintiff out as a co-parent of OEK, but Mother would vacillate depending on the then current nature of the relationship between the parties: When it was bad and Mother did not want to be in a relationship with Plaintiff, Mother would threaten to cut Plaintiff off from OEK; when it was good, or if Mother was seeking a reconciliation with Plaintiff, or, as with the quoted language from Ex. P-7, if they were separated and Mother wanted Plaintiff to perform her parental duties, Mother would accord Plaintiff the status of a parent. For her part, Plaintiff consistently attempted to co-parent OEK within

5

the constraints and limitations[2] periodically imposed by Mother. In fact, to further illustrate that Plaintiff held herself out as a parent, after OEK was born, Plaintiff announced at work that she and Mother had a baby, and there were several birth congratulation cards sent by Plaintiff's co-workers to Plaintiff which were found by Mother in a closet after the parties separated.

After separation of the parties in February of 2014, Plaintiff stopped contributing to the rent until August of 2017, but continued to buy diapers and clothes for OEK. Plaintiff was employed and Mother was living on a minimal disability income. After separation, the parties kept attempting to patch up their relationship until about December of 2017. Plaintiff frequently stayed overnight with Mother and OEK, perhaps not 4-5 times per week as claimed by Plaintiff, but contact was frequent. In addition, during that time, and in between short estrangements due to difficulties in the relationship between the parties, Plaintiff kept bearing a portion of food, diaper and clothing expenses for OEK and Mother. In addition, during that time, Plaintiff would co-parent OEK and was more than a mere babysitter. Mother's claim that she did not want to share her "status" as a parent with Plaintiff is incredible and is clearly contradicted by the many writings of Mother in which she acknowledges Plaintiff's status as a parent to OEK, her "son." See: Exs. P-4, P-5, P-6, P-7 and P-8. In Ex. P-7, Mother essentially begs Plaintiff to perform her duties as a parent to OEK and professing OEK's need for Plaintiff to do so.

---

[2] See, supra: Mother's April, 2016 move to western Pennsylvania, followed by a May, 2016 move to New Hampshire and her eventual return to Pennsylvania, to Bloomsburg, in August, 2017, to an apartment co-signed for by Plaintiff. During this time, Plaintiff was unable to participate due to the disappearance of Mother.

6

In April of 2016, Mother and OEK moved from Sunbury PA to western Pennsylvania to two (2) domestic violence shelters. It was at this time that Plaintiff alleged to Children and Youth Services that Mother was abusing OEK. In May of 2016, Mother moved to live near her family in New Hampshire. For a time, Plaintiff did not know where Mother and OEK had gone, and it was not until December of 2016 when Mother contacted Plaintiff that Plaintiff found out where Mother and OEK were located.

In 2017, Plaintiff went to New Hampshire to visit on four (4) occasions, in March, April, May and August. Plaintiff could not go to visit in June or July due to her mother having a terminal illness. In August, 2017, Mother decided to move back to Pennsylvania, to Bloomsburg, which is about 30 minutes from Sunbury where Plaintiff resides. Both parties found an apartment in Bloomsburg for Mother and OEK, and both parties co-signed the lease. The sewer and water bills were solely in Plaintiff's name and Plaintiff paid them from August of 2017 to February of 2018. Plaintiff would frequently stay overnight in the Bloomsburg apartment. Plaintiff paid one-half of the rent for the Bloomsburg apartment through February of 2018.

In November of 2017, Plaintiff went to a six (6) month residential trauma program. Mother declined to bring OEK for visits. Plaintiff did visit with OEK and Mother from December 20-23, 2017 at the Bloomsburg apartment during a leave of some sort from the trauma program. December 23, 2017 was the last time Plaintiff saw OEK.

In March, 2018, having been denied contact with OEK, Plaintiff filed the present action. At about the same time, or shortly after, the landlord of the Bloomsburg apartment told Plaintiff that Plaintiff should no longer pay any part of the rent, nor the

7

sewer or water bills. Because of that directive, Plaintiff has not contributed to any expenses since approximately February of 2018. During the relevant times, except from April 2016 to August 2017 when Mother and OEK moved to western Pennsylvania and then to New Hampshire, and after March of 2018, Plaintiff kept financially supporting Mother and OEK, contributing to rent, clothes, transportation and utility expenses. Plaintiff also regularly engaged in parenting OEK and OEK has a loving relationship with Plaintiff.[3]

Mother's intent and agreement to co-parent with Plaintiff, and to accord Plaintiff a parent-"son" relationship with OEK, are expressly confirmed in several documents entered into the record, in addition to Exs. P-4, P-5 and P-7, quoted above. In a handwritten note sent from Mother to Plaintiff around Thanksgiving of 2014, Mother stated:

> "I am so thankful, and honored to have the chances in life to know and experience love, true compassion, wisdom from mistakes, although I tend to repeat some. **I am truly blessed to parent [OEK] with you....**" (Emphasis added).

Ex. P-6. In two (2) emails sent on August 18, 2015, Mother again confirms Plaintiff's status as a "parent" and "mother" to OEK:

> [3:29 p.m.] ...C₁      don't do this please don't make me regret this for the rest of my life ... I beg you...I swear C      you will have to take [OEK] while I go into the hospital .... don't make me and [OEK] pay and burn in hell for the rest of our lives. **You are [OEK's] parent** he knows that ... he is going to hurt and grieve and suffer and it will have damage and impact .... I promised [OEK] I know what's in the best interest of my child and I put him first and he can't lose you ... you two can't lose each other ....

---

[3]See: Written confirmations from Mother that OEK loves Plaintiff: Exs. P-4, P-5, P-6, P-7 and P-8.

8

[9:23 p.m.]   Those are all your fears and you know it ..
[OEK] is here right now ... your being awful awful selfish
protecting your self for things.that are not even happening
and breaking a little boys heart.  Your supposed to do
anything for your kids including break your own heart down
the road but I never seen a more selfish **mother**.  You
disgust me. [sic] (Emphasis added).

Ex. P-8.

The leading cases on the subject of in loco parentis status being acquired by a

former paramour or spouse (in a broad sense, in this day and age, both stepparents)

are A.J.B. v. A.G.B., 2018 Pa.Super 50, 180 A.3d 1263 (2018), C.G. v. J.H., 2017

Pa.Super 320, 172 A.3d 43 (2017), T.B. v. L.R.M., 567 Pa. 222, 786 A.2d 913 (2001)

and J.A.L. v. E.P.H., 453 Pa.Super. 78, 682 A.2d 1314 (1996).  The general

requirements for finding in loco parentis status have been summarized as follows:

> "The term in loco parentis literally means 'in the place of a
> parent.' " Peters v. Costello, 586 Pa. 102, 891 A.2d 705, 710
> (2005) (citing Black's Law Dictionary, 791 (7th Ed. 1991)). A
> person stands in loco parentis with respect to a child when
> he or she "assum[es] the obligations incident to the parental
> relationship without going through the formality of a legal
> adoption. The status of in loco parentis embodies two ideas;
> first, the assumption of a parental status, and, second, the
> discharge of parental duties." Id. (quoting T.B. v. L.R.M., 567
> Pa. 222, 786 A.2d 913, 916-17 (2001)). Critical to our
> discussion here, "in loco parentis status cannot be achieved
> without the consent and knowledge of, and in disregard of [,]
> the wishes of a parent." E.W. v. T.S., 2007 PA Super 29,
> 916 A.2d 1197, 1205 (Pa.[Super.] 2007) (citing T.B., supra).

K.W. v. S.L., 2017 Pa.Super. 56, 157 A.3d 504, 504-05 (2017).

> Of relevance, looking to cases involving step-parents, we
> have held that former same-sex partners are entitled to in
> loco parentis standing as third parties where they "lived with
> the child and the natural parent in a family setting, whether a
> traditional family or a nontraditional one, and developed a
> relationship with the child as a result of the participation and

9

> acquiescence of the natural parent." J.A.L., 682 A.2d at
> 1321; see also T.B. v. L.R.M., 567 Pa. 222, 232-33, 786
> A.2d 913, 918-19 (2001).

A.J.B., 180 A.3d at 1275-1276.

In A.J.B., Mother was first in a relationship with her Ex-Wife, during which Mother

and Ex-Wife attempted conception together unsuccessfully. Mother and Ex-Wife

separated, during which time, Mother and Father conducted a relationship during which

the child was conceived. Thereafter, but before birth, Mother and Father's relationship

ended, and Mother and Ex-Wife reconciled. Ex-Wife was present at the birth of the

child, Ex-Wife was placed on the birth certificate as a parent. Mother and Ex-Wife

separated 5-6 weeks after the child was born, therefore, Mother, Ex-Wife and the child

lived in the same household for only 5-6 weeks, during which time Ex-Wife contributed

financially to the household. After separation, Ex-Wife continued her relationship with

the child, but financial support by Ex-Wife ceased. Mother and Ex-Wife entered into a

custody consent order without joinder of Father, thus resulting in that act being deemed

to be invalid. On these facts, the Pennsylvania Superior Court deemed Ex-Wife to

stand in loco parentis as to the child. The Superior Court explained its holding in A.J.B.

as follows:

> Upon review, we disagree with the trial court and find that
> Ex-Wife does have standing in loco parentis with respect to
> Child. The record reveals that Ex-Wife participated in the
> pregnancy and preparations prior to Child's birth, as well as
> Child's birth. N.T. at 9, 34, 38-39, 86, 103. Further, Mother
> and Ex-Wife were married at the time of Child's birth and,
> regardless of the ultimate length of the marriage, they had
> the intent to jointly raise Child "together in a happy
> marriage." Id. at 7, 22, 34, 47. Ex-Wife was named as a
> parent on Child's birth certificate and involved in the naming
> of Child. Id. at 34, 86, 104. Prior to Child's birth, Mother and
> Ex-Wife consulted an attorney regarding termination of

10

> D.F.'s parental rights. Id. at 39, 46-48, 103. Moreover, while
> there was some disparity as to the extent of Ex-Wife's
> involvement, Ex-Wife was clearly involved financially and
> otherwise during the marriage and remained involved in
> Child's life after separation. Id. at 13-14, 18-19, 34, 86-89,
> 91, 94-95, 101-02. Although known to family and friends that
> she was not Child's biological parent, Ex-Wife likewise held
> herself out as Child's parent.

A.J.B., 180 A.3d at 1278.

In the present case, Plaintiff, Mother and OEK lived together in the same household for 11-12 months, longer that that which was the case in A.J.B. As in A.J.B., the parties in the present case had the intent to jointly raise OEK as a "family," using Mother's words as well as Plaintiff's. In A.J.B, although the Mother and Ex-Wife tried to conceive together, they did not, and Mother was already pregnant from another relationship when Mother and Ex-Wife reconciled. Therefore, the pregnancy in A.J.B was not *the result* of pre-planning between Mother and Ex-Wife. In the present case, Mother's pregnancy was not the result of pre-planning between Mother and Plaintiff, in that Mother was 2 ½ months pregnant when they met. In both A.J.B and the present case, Mother and the parental claimant were present at birth. Although, in A.J.B, Mother placed Ex-Wife on the birth certificate as a parent, the court held that the exclusion of Father from prior custody proceedings was invalid due to that exclusion of Father. Although the court did not address it, it would seem that Mother's placement of Ex-Wife on the birth certificate, in apparent contravention of Father's status,[4] would have been invalid for the same reason that Mother and Ex-Wife's exclusion of Father from the custody consent order was invalid. In the present case, on OEK's original birth

---

[4] Concluding that, as a matter of law in Pennsylvania, the Department of Health would not permit placement of three (3) parents on a birth certificate.

11

certificate, Mother confirmed Plaintiff's status as an intended co-parent by giving OEK Plaintiff's surname.[5] Although, in A.J.B, the litigating parties were once married, marriage of the parties is not a fact which is required to find in loco parentis status. See: T.B. and J.A.L., where the parties were not married, but in loco parentis status was found. Plaintiff has been involved financially in every aspect of expenses incurred for OEK when permitted by Mother.[6] Also, when permitted by Mother, Plaintiff has consistently performed parenting duties and functions. Finally, as in A.J.B., it is found that both Mother and Plaintiff held OEK out as Plaintiff's son to the general community.

Beyond the parallels with A.J.B., in the present case, with Exs. P-4, P-5, P-6, P-7 and P-8, Mother manifested in several writings her clear intent and strong desire to create and permit a parent-son relationship between Plaintiff and OEK. In addition, Mother, in several exhibits, has shown that OEK has a loving bond with Plaintiff. Plaintiff presented as Ex. P-14 a remarkable video of OEK taken, or staged, by Mother in the fall of 2017 when Mother was seeking a reconciliation with Plaintiff. In the video, OEK is 4 ½ years old and is prompted several times by Mother. It is presented as a plea from OEK to Plaintiff to return to "us" so all three persons could "be a family." OEK

---

[5] Use of the surname of the party claiming in loco parentis status on the birth certificate is one fact which may weigh in favor of finding in loco parentis status. See: J.A.L., supra.

[6] The only times during which Plaintiff made no contribution was: (1) from April 2016 to December 2016 when Mother moved to western Pennsylvania and then to New Hampshire and Plaintiff did not know her whereabouts; and (2) after March of 2018, contemporaneously with Plaintiff's filing of the present action, when Mother's landlord told Plaintiff that a new lease as to Mother's residence in Bloomsburg had been drafted which excluded Plaintiff, and that Plaintiff should no longer pay rent or utilities for that apartment. Due to the contemporaneous nature of these events, this court makes the circumstantial determination of fact that exclusion of Plaintiff from the Bloomsburg lease was in direct response to Plaintiff's assertion of her rights in filing the present case.

12

states to Plaintiff in the video that he loves her and closes by kissing the camera lens as if he were kissing Plaintiff. Although it is extremely unfortunate that Mother put OEK up to such a tactic, it is clear that OEK loves Plaintiff as "family." Granting Plaintiff in loco parentis standing is only the first step in this case. The second will be application of a best interest standard to determine the relative custodial rights of the parties.

In C.G., the Superior Court summarized T.B. and J.A.L. as follows:

> In T.B., the trial court found that a same-sex partner, T.B., had in loco parentis standing to the child at issue, A.M. This Court and the Supreme Court of Pennsylvania affirmed. In its opinion, the Supreme Court deferred to the trial court's factual findings because the record supported them. T.B., 786 A.2d at 919. Those findings included that the parties "engaged in an exclusive, intimate relationship," "shared finances and expenses," "jointly purchased a home," "decided to have a child," and "agreed that [the biological mother, L.R.M.] would be impregnated by a sperm donor and that [T.B.] would choose the donor." Id. at 914-15 (footnote omitted). T.B. "cared for [L.R.M.] during her pregnancy and attended childbirth classes with her[, and] was the designated co-parent for purposes of being present in the operating room during the birth." Id. at 915. After the child was born, the parties lived together with the child but did not enter into a formal parenting agreement. Id. L.R.M. named T.B. as guardian of the child in her will. Id. L.R.M. and T.B. "shared day-to-day child rearing responsibilities, including taking [the child] for medical check-ups and other appointments." Id. T.B. "was active, yet deferential to [L.R.M.] in making parental decisions." Id. Accepting the trial court's findings, the Court agreed that T.B. stood in loco parentis and had standing to seek partial custody. Id. at 919-20.
>
> In J.A.L., this Court reversed a trial court ruling that a same-sex partner, J.A.L., lacked in loco parentis standing with respect to the child there at issue, G.H. J.A.L., 682 A.2d at 1316. We stated that "[t]he facts as found by the trial court clearly indicate that [the biological mother,] E.P.H. and J.A.L. lived together ... as a nontraditional family, for many years before the birth of the child" and that the child "was to

13

be a member of their nontraditional family." Id. at 1321. Those facts included: "the parties agreed that E.P.H. would be artificially inseminated to attempt to conceive a child whom the parties would raise together"[;] the parties selected a sperm donor together; J.A.L. performed the inseminations; J.A.L. accompanied E.P.H. to doctor visits and childbirth classes; J.A.L., along with two other friends of E.P.H., was present at the birth of the child; and the child was given J.A.L.'s surname as a middle name. Id. at 1316. In addition, before the child's birth, the parties consulted an attorney who drafted documents, including "a Nomination of Guardian in which E.P.H. named J.A.L. as the guardian of the child in the event of E.P.H.'s death or disability"; "an Authorization for Consent to Medical Treatment of Minor, permitting J.A.L. to consent to medical or dental treatment of the child[;]" "a Last Will and Testament for each party, providing for the other party and the child[,]" and, in E.P.H.'s will, a clause appointing J.A.L. as the guardian of the child; and a co-parenting agreement. Id. at 1316-17. The parties executed all of these documents except for the co-parenting agreement, which J.A.L. refused to execute after counsel advised the parties that the agreement was not enforceable in Pennsylvania. Id. at 1317. After the child's birth, the parties lived together with the child, and J.A.L. "assisted with all aspects of the care of the baby." Id. After the parties separated, J.A.L. visited the child frequently and regularly. Id. at 1317, 1322.

C.G., 172 A.3d at 57-58. The Superior Court in C.G. then went on to distinguish C.G., where it found no in loco parentis status, from T.B. and J.A.L. where in loco parentis status was found:

> The court's holding rests on the unique facts of this case, and there are significant distinctions between this case and T.B. and J.A.L., the main decisions on which C.G. relies. For example, in T.B. and J.A.L., the parties decided together to have a child; here, the court credited J.H.'s testimony that C.G. "never agreed to have a child, but merely tolerated the idea of [J.H] having a child." Moreover, unlike the parties seeking custody in T.B. and J.A.L., C.G. did not participate in educational or medical decisions regarding the child, was not intended to be the child's guardian if something happened to J.H., and acted more like a babysitter than a

14

parent. Further, there were no formal documents indicating a co-parenting arrangement, the child did not bear C.G.'s surname, and C.G. did not visit the child frequently and regularly after the parties separated.

C.G., 172 A.3d at 58-59 (citations omitted). In the present case, it is acknowledged that the parties did not decide together to have a child, but, at least at the time of conception in A.J.B., Mother and Ex-Wife did not plan on conceiving a child, but that did not bar a finding of in loco parentis status. In the present case, the parties clearly agreed to raise OEK together, "as a family." Further, unlike in C.G., in the present case, Plaintiff participated in medical, religious, speech therapy and other educational decisions. Plaintiff performed parental duties, not just those of a babysitter as in C.G. Although there was no formal signed co-parenting agreement in the present case, there also was none in T.B. or J.A.L. In fact, in J.A.L., one of the parties balked at signing such a co-parenting agreement. Nonetheless, in loco parentis status was found in T.B. and J.A.L. Akin to a formal agreement, however, the parties in the present case clearly verbally agreed, and, although co-parenting agreements need not be in writing under any applicable statute of frauds, Mother wrote and signed several documents in which she confirmed her intention to bestow parent status on Plaintiff.

For these reasons, given the totality of the circumstances, it is found that the present case is more analogous to A.J.B., T.B. and J.A.L., and is significantly and materially distinguishable from C.G. As such, Plaintiff is entitled to in loco parentis standing and the Defendant's Preliminary Objections will be denied.

15

## ORDER

AND NOW, to wit, on this 17th day of September, 2018, on the basis of the analysis set forth in the foregoing Opinion, the Preliminary Objections filed by the Defendant on April 9, 2018 are hereby OVERRULED, DENIED and DISMISSED and Plaintiff is found to have in loco parentis standing in the present case. The matter is hereby forwarded to the Special Masters in custody of the 26th Judicial District for the conduct of a custody conference consistent with local procedure.

BY THE COURT:

_____ J.
HONORABLE GARY E. NORTON, J.

16